## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**12 CIV 0781**

| | |
|---|---|
| MANUEL BOLIVAR, ANDRES RUBIO and JANNETH QUINTERO, individually and on behalf of all those persons similarly situated, )<br><br>Plaintiffs, )<br><br>v. )<br><br>FIT INTERNATIONAL GROUP CORP., FOREX INTERNATIONAL TEAM INC., JAIRO ENRIQUE SANCHEZ, and DILIA MARGARITA BAEZ, )<br><br>Defendants. ) | CASE NO.:<br><br>**ECF CASE**<br><br>**JURY TRIAL DEMANDED** |

FEB 01 2012
U.S.D.C. S.D.N.Y.
CASHIERS

### CLASS ACTION COMPLAINT

Plaintiffs Manual Bolivar ("Bolivar"), Andres Rubio ("Rubio") and Janneth Quintero ("Quintero," and collectively "Plaintiffs"), individually and on behalf of all those persons similarly situated, by and through their attorneys, allege the following based upon the investigation of counsel, except as to allegations concerning Plaintiffs, which are based upon personal knowledge. The investigation of counsel included, among other things, a review of public filings, media and news reports, and publicly available documents and other information.

### NATURE OF THE ACTION

1.      This is a federal and state law class action, brought by Plaintiffs, individually and on behalf of all of those persons (the "Class" or "Class Members") who invested funds for trading in foreign currency with Defendants Jairo Enrique Sanchez ("Sanchez") and Dilia Margarita Baez ("Baez"), through their purported corporation and/or limited liability company FIT International Group, and Defendants FIT International Group Corp. and Forex Investment

Team Inc. (collectively "FIT"), as well as other foreign corporate entities, between January 1, 2000 and August 25, 2009, inclusive (the "Class Period").

2.      This class action is brought under Sections 4b(a) and 22(a) of the Commodities Exchange Act of 1933 ("Exchange Act"), 7 U.S.C. §§ 6b(a)(2)(A)-(C), 25(a), and Regulation 1.1(b) promulgated thereunder, 17 C.F.R. § 1.1(b), Sections 1962(c) and (d), and 1964(c) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. §§ 1962(c) and (d), 1964(c), as well as under state common law, on behalf of all those who invested funds through FIT during the Class Period to recover damages caused to the Class by Defendants' violations of the federal commodities and RICO statutes, and state common law.

3.      Sanchez and Baez orchestrated an international Ponzi scheme, stealing significantly in excess of $100 million from deceived investors in the United States and abroad. They executed this scheme principally through their Florida corporation, FIT International Group Corp. ("FIT Corp."), and fraudulent representations concerning a nonexistent purported New York corporation and/or limited liability company, FIT International Group, in addition to at least three other corporate instrumentalities, Forex International Team Inc. (New York) ("FIT New York"), FIT Forex Investment Team S.A. (Colombia) and FIT Forex Investment Team AG (Switzerland), among several other front companies — all mere deceptive devices for Sanchez and Baez's fraudulent schemes.

4.      In a recent effort to escape liability for their fraud and to persuade investors that they were working on behalf of their best interests, Sanchez, through FIT Corp., attempted to manipulate Florida Statutes, Chapter 727, purporting to effectuate an assignment for the "benefit" of creditors and claiming remaining funds of only $12,690.74 from over $100 million collected from investors over several years.  And when questioned under oath concerning this

discrepancy, and any other question about their fraudulent scheme, *Sanchez and Baez both pleaded their Fifth Amendment right against self-incrimination.*

5.      There is little doubt that Sanchez, Baez, FIT Corp. and FIT New York (along with their foreign corporate instrumentalities) defrauded investors out of millions, for which they are now facing potential criminal liability.  This action seeks to recover, on behalf of the class of defrauded investors, all of the funds fraudulently and unlawfully misappropriated by Defendants, as well as interest, costs, attorneys' fees and any other damages recoverable under law.

## JURISDICTION AND VENUE

6.      This action arises under Sections 4b(a) and 22(a) of the Commodities Exchange Act of 1933 ("Exchange Act"), 7 U.S.C. §§ 6b(a)(2)(A)-(C), 25(a), and Regulation 1.1(b) promulgated thereunder, 17 C.F.R. § 1.1(b), Sections 1962(c) and (d), and 1964(c) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. §§ 1962(c) and (d), 1964(c), and state common law.  In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and international wires.

7.      This Court has subject matter jurisdiction over this action pursuant to Section 22(c) of the Exchange Act, 7 U.S.C. § 25(c), Section 1964(a) of RICO, 18 U.S.C. § 1964(a), and 28 U.S.C. §§ 1331 and 1332.  Plaintiffs and the proposed Class bring claims that, in the aggregate, exceed $5,000,000.  Upon information and belief, a sufficient number of Class Members are citizens of foreign countries or states other than New York.  The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this district pursuant to Section 22(c) of the Exchange Act, 17 U.S.C. § 25(c), Section 1965 of RICO, 18 U.S.C. § 1965, and 28 U.S.C. § 1391, insofar as a

substantial part of the events or omissions giving rise to this action occurred within this District, including but not limited to the use of the mails and other interstate facilities to communicate with and disseminate misleading information and statements to clients.  Defendants conduct substantial business and maintain offices within this District.

## PARTIES

9.      Manuel Bolivar ("Bolivar") is an individual who is a citizen of Florida.

10.     Andres Rubio ("Rubio") is an individual who is a citizen of Florida.

11.     Janneth Quintero ("Quintero") is an individual who is a citizen of Florida.

12.     Jairo Enrique Sanchez ("Sanchez") is an individual whose last known address is Calle 100, #8A-37, Torre A #501, Bogota, Colombia.

13.     Dilia Margarita Baez ("Baez") is an individual whose last known address is Calle 100, #8A-37, Torre A #501, Bogota, Colombia.

14.     FIT International Group Corp. ("FIT Corp.") is a corporation organized under the laws of the State of Florida with its principal place of business at 7300 N.W. 19th Street, Suite 101, Miami, FL 33126-1222.  FIT Corp. was incorporated, on May 12, 2003, by Baez.  FIT Corp. has only two directors on its board, Sanchez and Baez.  Baez is also the President. Sanchez is the Treasurer and Secretary of the company.  There are no other officers.  FIT Corp. has only two stock holders, Baez and Sanchez.

15.     Upon information and belief, Forex International Team Inc. ("FIT New York") is a New York corporation, with its principal place of business at 14 Wall Street, 20th Floor, New York, NY 10005.  FIT New York also does business under the name FIT Markets.  Baez is the President and sole officer, and Sanchez is the sole Director, of the company.

## CLASS ALLEGATIONS

16.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class of all persons who invested funds through FIT Corp., purportedly with FIT International Group, during the period from January 1, 2000 through August 25, 2009, inclusive (the "Class Period"). Excluded from the Class are the Defendants herein, the officers and directors of Defendants, members of their immediate families and their legal representatives, affiliates, controlling persons, heirs, successors or assigns, predecessors in interest and any entity in which Defendants have or had a controlling interest.

17.     Members of the Class are so numerous that joinder of all of the members of the class is impracticable. Counsel for Plaintiffs has been contacted by, and advises, several hundred victims of Defendants' misconduct. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. While the exact number of Class Members is unknown at present and can only be ascertained by appropriate discovery, counsel has knowledge of approximately 600 investors, and believes there may be more than 600 members of the Class located throughout the United States and the rest of the World.

18.     Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all Class Members were similarly affected by Defendants' wrongful conduct and have sustained damages as a result of Defendants' unlawful activities as alleged herein.

19.     Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs retained counsel competent and experienced in class and complex litigation, and intend to pursue this action vigorously. Plaintiffs have no interest that is contrary to or in conflict with the interests of the prospective members of the Class whom Plaintiffs seek to represent.

20.     A class action is a superior method of adjudication of these claims, over all other available methods for the fair and efficient resolution of this controversy. There is no difficulty, and Plaintiffs have no knowledge of any difficulty, in the management of this action as a class action.

21.     Common questions of law and fact exist as to all Class Members, and such common questions predominate over any questions solely affecting individual members of the Class, including but not limited to:

    a.   whether the federal commodities laws were violated by Defendants' acts and omissions as alleged herein;

    b.   whether the Racketeer Influenced and Corrupt Organizations Act was violated by Defendants' actions as alleged herein;

    c.   whether Defendants omitted and/or misrepresented material facts in their uniform solicitation and concerning their management of funds from clients;

    d.   whether Defendants' uniform statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

    e.   whether Defendants knew or recklessly or deliberately disregarded that their uniform statements were false and misleading, omitting material information;

    f.   whether Defendants breached common law fiduciary duties owed to the Class Members; and

    g.   the extent of damages sustained by the Class Members and the proper measure of such damages.

## FACTUAL ALLEGATIONS

### I.   DEFENDANTS CLAIMED TO BE EXPERTS IN THE FOREIGN CURRENCY TRADING (FOREX) MARKET

22.    For years, Jairo Enrique Sanchez ("Sanchez") and Dilia Margarita Baez ("Baez") marketed themselves as foreign currency trading experts.  They purported to operate a school instructing others in Forex trading.

23.    Forex is the common name for the trading market in foreign currency, one of the largest markets in the world.  Forex trading is not conducted on a central exchange, but through an interbank market, an over the counter exchange, where parties trade directly with each other over the telephone or through electronic networks all over the world.  The Forex trading market trades approximately three trillion dollars a day.  Most trading in the Forex market is speculative, attempting to take advantage of movements within the exchange rates between currencies as interest rates and other factors cause them to change.  Sanchez and Baez sold themselves as experienced experts in this market.

24.    In an ordinary Forex transaction, investors trade two currencies, for instance buying European Euros with United States Dollars, or vice versa.  There are no commissions, but rather prices are quoted based on a spread between the buying and selling price for the currencies.  The major commonly traded currencies are designated, for example, EURUSD (euros to dollars), USDJPY (dollars to yen) and GBPUSD (pounds to dollars).  Forex trades are ordinarily traded on margin, requiring only a relatively small deposit to trade larger positions in the market, sometimes as low as 1% (requiring, for example, only a $1 deposit to trade $100).

25.    Because there are no daily limits on trading or the hours for trades, except weekends, there is nearly always an opportunity to react to moves in the main currency markets and a low risk of being caught in an investment without an opportunity to exit.

## II.   DEFENDANTS CREATED A SOPHISTICATED, FRADULENT CORPORATE ENTERPRISE TO EXECUTE AN INTERNATIONAL PONZI SCHEME

26.     Sanchez and Baez marketed their expertise directly and through various different corporate entities, including Forex Investment Team AG ("FIT Switzerland"), a company incorporated in Switzerland, and registered as an investment advisor in Colombia, that Sanchez and Baez used to solicit clients in Colombia and throughout the world.  Sanchez and Baez also used Forex Investment Team S.A., a Colombian company ("FIT Colombia"), which was not authorized to solicit clients for investment purposes.

27.     As part of their scheme, Sanchez and Baez claimed to execute a proprietary Forex trading strategy through FIT Investment Group, a purported corporation, and at other times a purported limited liability company, organized under the laws of the State of New York ("FIT Group").  No such company has ever been incorporated, as a corporation or limited liability company, in New York, however.  Only Defendant Forex International Team Inc. ("FIT New York.") was incorporated in New York, and like FIT Switzerland and FIT Colombia, was merely a marketing and promotional instrumentality used to defraud investors and solicit funds for the scheme.

28.     Indeed, "FIT International Group," a purported New York corporation or limited liability company, was merely a sham to avoid any legitimate, enforceable contractual relationships with investors.  All of the transactions supposedly executed by FIT Group were conducted by other real corporate entities and by Sanchez and Baez.

29.     Sanchez and Baez solicited clients mainly by marketing to them through social connections.  In particular, Mauricio Vasquez Uribe ("Uribe"), a dentist in Colombia, advertised FIT Group and its purported stable returns to a substantial number of investors.  At various times, Plaintiffs were introduced to FIT Group by Uribe.  Uribe would host investment meetings

8

for potential investors at his brother's home in Miami, Florida, and at his dental offices in

Colombia, and in clients' homes, to solicit individuals to invest in FIT Group. In soliciting

Plaintiffs, Uribe gave them each the same presentation regarding FIT Group and its Forex

trading strategy, including the use of stop loss orders to limit exposure to significant losses, and

showed them all the same video produced by Sanchez and Baez regarding FIT Group. He

showed them his investment statements from FIT Group and the profitable returns that he had

received from his investment. He also provided them with fictitious, unenforceable trading

agreements to sign purportedly with "FIT International Group," a nonexistent sham. Upon

information and belief, Defendants marketed their fraud in the exact same manner to all Class

Members, regardless whether through Uribe or others.

30.     As Sanchez and Baez began to solicit more investors, and in order to elevate the

sophistication of their scheme, and to provide an added measure of perceived legitimacy, on

May 12, 2003, Baez incorporated yet another company, FIT International Group Corp. in the

State of Florida ("FIT Corp." and together with Sanchez, Baez, and FIT New York, "FIT" or

"Defendants"). Sanchez and Baez were the sole shareholders, the sole directors, and the sole

officers of the company. Sanchez and Baez used FIT Corp. to open bank accounts with

JP Morgan Chase, N.A. ("JPMorgan") in New York, assuring investors that their money would

be deposited into segregated accounts at a reputable United States bank.

## III.    DEFENDANTS SOLICTED OVER $100 MILLION FROM INVESTORS WITH FALSE PROMISES OF CONSISTENT, PROFITABLE RETURNS AND PROTECTION FROM SUBSTANTIAL LOSS

31.     Sanchez and Baez, directly and through their various marketing and promoting

entities, including FIT New York, fraudulently marketed their fictitious Forex trading company,

FIT Group, and promoted false and misleading invalid, unenforceable trading agreements with

FIT Group to investors. They showed investors false statements, promising consistent, profitable

monthly returns of approximately 3-4% over several years. Defendants promised investors that their investments were protected because FIT had stop loss measures in place to limit any negative losses on investments.

32.     And they made other false promises. Defendants fraudulently promised that FIT Group "has all of the applicable required government approvals, licenses, and permits, including but not limited to, if applicable, registration with the (National Futures Association "NFA") as a commodity trader advisor (CTA)." Sanchez and Baez, directly and through FIT New York and other corporate instrumentalities, claimed that:

- All customer accounts are segregated as a sub-account of one major FIT account.
- All customer accounts will have trades executed via the FIT account and FIT trading lines.
  ...
- The automated FIT trading system will distribute profits and losses accordingly to all customers.

33.     In reality FIT Group did not exist, and it was merely one of the devices through which Sanchez and Baez defrauded investors, along with their corporate instrumentalities FIT Corp. and FIT New York, as well as FIT Switzerland and FIT Colombia. In reality, none of the Defendants were registered with the NFA or the Commodity Futures Trade Commission ("CFTC"). While applications had been pending with the NFA, those applications were never approved. In reality, customer accounts were not segregated, but were pooled into one account at JPMorgan and later Bank of America, both in New York. Upon information and belief, in reality, Defendants did not engage in Forex trading as represented (if at all), but devised a scheme merely to steal the funds that clients had invested with them.

34.     Over the course of several years, FIT collected over $100 million from investors, which was initially deposited into accounts at JPMorgan and later Bank of America in August

10

2008. Upon information and belief, FIT collected money from clients as early as 2000. As to Plaintiffs, Bolivar invested $182,000 with FIT, Rubio invested $110,000 and Quintero invested $137,000.

35.     Defendants never invested the money in Forex trading as they had promised, but merely siphoned it away to secret private accounts at HSBC, UBS, and others. Defendants then used the funds for their own purposes.

36.     In order to deceive clients that Defendants were trading on their behalf, with consistent, profitable returns, FIT provided investors internet access through www.forexfit.com and www.fitcolombia.com, to false and misleading electronic monthly statements that purportedly showed profitable foreign currency trades, and increasing investment returns over a consistent period. Contrary to their representations and statements, upon information and belief, FIT never invested in the amounts they had claimed and merely produced false trades to cover their misconduct and report false profits to investors.

37.     These false monthly statements showed consistent, stable returns to investors for years, in spite of significant market volatility. Indeed, FIT used these false returns to solicit new clients and additional funds, claiming that their investment strategy was reliable and profitable.

38.     Over time, however, as withdrawals and redemptions increased, coupled with decreasing new investors, the Ponzi scheme began to unravel. As a consequence, in December 2008, Defendants were forced to deposit over $6 million back into the FIT Corp. operating account at Bank of America to continue meeting withdrawals and redemptions. Uribe, the dentist who introduced most of the clients to Defendants, began warning investors in November and December 2008 to pull their money out of FIT because he had concerns over their

11

operations.  He had visited Defendants' purported New York offices only to find the offices
empty.  On December 1, Uribe redeemed his entire investment in FIT, in total $2,269,655.65.

39.     Investors questioned Defendants about Uribe's claims, and Sanchez and Baez
publicly expressed outrage about Uribe's actions and statements, and continued to claim to
investors that they were operating a legitimate enterprise, and that investors' money would be
available to them at any time.  Internally, however, sensing a collapse of the scheme, Defendants
made final preparations for an exit.

**IV.     AS THEIR SCHEME BEGAN TO UNRAVEL, DEFENDANTS
PREPARED AND EXECUTED A DECEPTIVE AND FALSE EXIT
SCHEME CLAIMING FICTITIOUS MASSIVE LOSSES**

Preparing For An Eventual Exit, Defendants Crafted New Trading
Agreements to Deceive Investors About Their Legal Rights

40.     In anticipation of the inevitable collapse of their Ponzi scheme, in 2007,
Defendants made preparations to deceive investors regarding the loss of their investments.   First,
Sanchez and Baez changed the purported trading agreement with FIT Group to allow FIT to "act
as the counter-party to the Trader in all such transactions."  Had FIT been the counterparty
during its years of purported profitable returns, it would have lost significant money to investors.
Second, Sanchez and Baez broadened the purported arbitration provisions so that "Neither
Trader nor FIT [Group] shall be entitled to join or consolidate disputes by or against others in
any arbitration, or to include in an arbitration any dispute as a representative or member of a
class ...."

41.     While the trading agreements were invalid and unenforceable, because FIT Group
did not exist, the new changes put Defendants in a position to further advance their fraud against
the Class.  Defendants now had the option of claiming "losses" in transactions to which FIT was

12

a counterparty in clear breach of the fiduciary duty owed to investors, and deceiving investors that they had no legal recourse through a class action.

### When They Were Ready, Defendants Manufactured Massive Losses On Investor Account Statements — The First Time In Their History

42.     With the new trading agreements in place since 2007, and the scheme collapsing under the weight of increased redemptions in December 2008, Defendants began to announce bad news for the first time in their trading history.

43.     In January 2009, FIT released statements with uncharacteristically low, but still positive returns. While the returns varied investor to investor, the returns were generally well below 1%. Then, in February 2009, FIT reported its first loss. Returns were uniformly negative, in the range of 1-2% for each investor. In addition, and to avoid the potential for requested redemptions based on the February 2009 statements, FIT also showed open trade positions with substantial losses. **This was the first time FIT had open positions.**

44.     Upon receiving the weak profits in January and the losses and open positions in February, investors began requesting significant redemptions of their investments. While Defendants claimed they would provide the requested redemptions, none were ever provided.

45.     By February 2009, Defendants had begun to refuse expressly to provide withdrawals or redemptions, claiming that they had open positions in the market that they first needed to close, refusing to allow clients to remove any funds until the positions were closed. This was the first time FIT had ever suspended withdrawals or redemptions.

46.     As early as March 2009, investors began revoking the limited power of attorney they provided to FIT Group to trade on their behalf, but Defendants never complied.

47.     In March 2009, once the supposed open positions were closed, FIT posted catastrophic losses of purportedly as much as 70% and 80% to investor accounts.

48.     Their timing was: **PERFECT**.  Indeed, too perfect to be legitimate.  Upon information and belief, Defendants merely manufactured false reports of losses on paper transactions that they purposely selected to defraud investors.

49.     For each of the three claimed open positions, one in GBPUSD (British Pounds to US Dollars) and two in EURUSD (EU Euros to US Dollars), Defendants sold right before the market shot back into hugely profitable returns.  In the case of the two EURUSD positions, Defendants sold one and two weeks before those positions would have reaped tremendous returns.  In the GBPUSD position, Defendants sold at the exact lowest point before a period of continuous recovery, to break-even within a month and again tremendous returns the next month.

50.     **This was not by chance.**  The purchase dates for those positions were selected after the fact to avoid extreme volatility and disastrous declines only months before, which would have required Defendants to attempt to collect more money from investors to cover the losses.  In addition, the purchases were just at the right declines in the market to create the perception of losses to wipe out investors *almost* completely.  The positions were claimed to have been sold at the exact lowest points in those currency exchanges in years.

51.     Upon information and belief, Defendants never traded these positions, but selected them later and falsely reported fictitious losses.

52.     Sanchez and Baez had been looking for this opportunity for months.  Upon information and belief, the positions were consciously selected at the beginning of the month (February 9 and February 10, 2009) to provide Sanchez and Baez a clear picture of the losses they could manufacture right before making statements available at the end of the month, and were purportedly sold at the beginning of the next month (March 3, March 10 and March 11, 2009) before any recovery movements could disrupt their scheme.

53.     Indeed, the purported EURUSD positions, which were allegedly purchased at $1.3090 and $1.3072 and sold at $1.2460 and 1.2642 respectively, if sold only a week or two later on March 19, 2009, would have been sold at $1.3661 — for a dramatic increase and profit.



54.     And the purported GDPUSD position, sold on March 10, 2009 for a substantial loss had fully recovered by April 14, 2009 and was extremely profitable by June 2, 2009.



55.     Yet, in each case, Defendants claimed to have sold those positions for substantial losses at the LOWEST points those positions had been and NEVER returned after they were sold.

56.     And not only did Defendants sell GDPUSD on the worst possible date, they supposedly oversold, taking a short position and selling the currency for an additional significant loss to investors later on March 18, 2009.

57.     This was merely a fiction manufactured on paper.

58.     But in spite of these significant losses, FIT still produced statements showing that clients had sizable remaining investments.

59.     Facing almost complete redemption requests for the remaining funds, however, FIT again falsely claimed that they were processing all requests and would issue returns shortly. The returns never came. Investors then demanded information to verify the purported transactions that produced the catastrophic losses, including the counterparties and interbank records. Defendants could not produce any evidence of the trades.

60.     Rather than investing client funds in the particular Forex trading strategy they promised, upon information and belief, Defendants merely parked clients' funds in various JPMorgan, Bank of America, HSBC, UBS and other bank accounts and used the money to fund their fraudulent operations to promote their Ponzi scheme. Upon information and belief, Defendants also paid themselves and friends, and misappropriated substantial amounts of funds to other business ventures, including Swiss, Panamanian and Colombian front companies controlled by Sanchez and Baez.

To Conceal Their Fraud, Defendants Fraudulently Declared Bankruptcy
Under Florida Assignment Laws

61.     On August 25, 2009, facing mounting demands from investors for explanations,

and a legal action already filed against defendant FIT Corp. in Florida, Sanchez, through FIT

Corp., tried to manipulate the legal system one more time and abscond with investors' money

without any material legal recourse.  FIT Corp. executed an assignment for the "benefit" of

creditors under Florida Statutes, Chapter 727.  An assignment for the benefit of creditors is a

special proceeding provided in Florida for debtors to settle disputed claims to remaining assets of

a company, a truncated bankruptcy or reorganization at less cost and procedural complication.

FIT Corp. claimed that it was "unable to pay its debts as they become due."  FIT Corp. claimed

that it only had $12,690.74 in several banks, including the initial JPMorgan accounts and

accounts at Bank of America and Wachovia.

62.     The JPMorgan account was reported as "CLOSED" as of May 29, 2009.  The

Bank of America accounts had less than $7,500.

63.     For the millions of dollars, well in excess of $100 million, that FIT Corp.,

Sanchez and Baez collected, they could only account for $12,690.14.  Defendants did provide

limited bank account statements, however.  Client funds were not segregated, as promised.  And

the statements could only account for fewer than several thousand dollars in funds.  **None**

**showed the payment of any catastrophic loss in March 2009.**

64.     On November 20, 2009, at a scheduled examination for purposes of the

assignment for the benefit of creditors, Sanchez and Baez appeared on behalf of FIT Corp. to

answer the unresolved questions concerning their investment activity and to account for client

funds.  In response to every single question asked, however, Sanchez and Baez pleaded their

Fifth Amendment right against self-incrimination.

## CAUSES OF ACTION
### COUNT I – FRAUD
**(Against Sanchez, Baez and FIT New York)**

65.     Plaintiffs, individually and on behalf of the Class, hereby incorporate by reference Paragraphs 1 through 64 as if set forth fully herein.

66.     Defendants Sanchez, Baez and FIT New York made uniformly false statements to Class Members in order to solicit their investments through FIT Group. They falsely represented that FIT Group was a New York corporation and/or limited liability company. In fact, FIT Group had never been incorporated in New York or any other state. FIT Group was merely a fraudulent artifice (and enterprise) created to avoid contractual liability to the Class. Defendants Sanchez, Baez and FIT New York falsely represented that FIT Group "has all of the applicable required government approvals, licenses, and permits, including but not limited to, if applicable, registration with the NFA as a commodity trader advisor (CTA)." In fact, neither FIT Group nor any other Defendant had any proper license or government approval to solicit or invest client funds. In addition, Defendants Sanchez and Baez, directly and through FIT New York and other corporate instrumentalities, falsely claimed that:

- All customer accounts are segregated as a sub-account of one major FIT account.
- All customer accounts will have trades executed via the FIT account and FIT trading lines.
- ...
- The automated FIT trading system will distribute profits and losses accordingly to all customers.

In fact, no customer accounts were segregated. No trades were executed as represented by Defendants.

67.     In addition, over the course of their purported trading in the Forex market, Defendants produced false and misleading client account statements, purporting to show trades

and profits, with stable, consistent returns over a sustained period of time, regardless of volatility in the market. In fact, these statements were false and Defendants had not traded in the currency and amounts they had claimed, but were merely siphoning money from clients for their own personal benefit and use.

68. Defendants had actual knowledge that these statements were false when they made them and made such statements intentionally so that the Class Members would rely upon them. All of these false representations were material and were reasonably, justifiably relied upon by members of the class in deciding to invest and maintain their investments with Defendants. Neither Plaintiffs nor any member of the Class had any knowledge of Defendants' fraud, nor could have known.

69. As a direct and proximate cause of Defendants' intentionally and materially false statements, Plaintiffs, and members of the Class, suffered damages.

## COUNT II – BREACH OF FIDUCIARY DUTY
### (Against Sanchez, Baez and FIT Corp.)

70. Plaintiffs, individually and on behalf of the Class, hereby incorporate by reference Paragraphs 1 through 69 as if set forth fully herein.

71. Because of Defendants' special knowledge and expertise, Plaintiffs, and members of the Class, placed special trust and confidence in Defendants to trade in the highly sophisticated and complex market in foreign currency exchange. As a consequence of this special relationship of trust and confidence, Defendants owed Plaintiffs, and members of the class, fiduciary duties of care, loyalty and honesty and candor.

72. Defendants substantially breached their fiduciary duties to Plaintiffs, and members of the Class, by failing to trade in the manner advertised and promoted, merely diverting client funds for their own personal benefit and use, and to promote their fraud.

73.     In addition, Defendants breached their fiduciary duties to Plaintiffs, and members of the Class, by failing to segregate client funds, as promised, engaging in self-dealing in certain transactions, falsely reporting their trading activity and the status of clients' accounts as well as misappropriating client funds.

74.     As a direct and proximate cause of Defendants' breach of their fiduciary duties, Plaintiffs, and members of the Class, suffered damages.

**COUNT III – CONVERSION**
**(Against Sanchez, Baez and FIT Corp.)**

75.     Plaintiffs, individually and on behalf of the Class, hereby incorporate by reference Paragraphs 1 through 74 as if set forth fully herein.

76.     Upon information and belief, Defendants Sanchez and Baez, through FIT Corp., unlawfully converted investment funds from clients for their own personal benefit and use.

77.     Over the course of several years, claiming that they were investing clients' funds in the Forex market, and reporting significant profits, upon information and belief, Defendants were merely stealing funds to promote their scheme and for their own personal benefit, including diverting assets to foreign companies and entities associated with Defendants.

78.     Plaintiffs, and the members of the Class, had a right to all of the money they invested with Defendants, and in particular to the purported remaining balance of funds in client accounts, as of March 2009.

79.     Defendants substantially and materially interfered with the Plaintiffs', and Class Members', rights by the unauthorized diversion of clients' invested funds for Defendants' own purposes and in support of their Ponzi scheme.  Defendants' exercise of dominion and control over client funds for their own purposes was an unauthorized, unlawful conversion.

80.     As a direct and proximate cause of Defendants' conduct, Plaintiffs, and members of the Class, suffered damages and injury to property.

## COUNT IV – UNJUST ENRICHMENT
### (Against all Defendants)

81.     Plaintiffs, individually and on behalf of the Class, hereby incorporate by reference Paragraphs 1 through 80 as if set forth fully herein.

82.     Plaintiffs, and members of the Class, conferred substantial benefits upon Defendants, by providing them with significant capital for investment.  Contrary to their representations, however, Defendants did not invest the funds as promised but engaged in a fraudulent scheme to enrich themselves at the expense of their clients.

83.     All of the money that Defendants diverted to their personal accounts, and used to maintain offices and residential properties throughout the world, were wrongfully stolen from Plaintiffs, and the members of the Class, without any corresponding benefit or compensation.

84.     Indeed, Defendants orchestrated a scheme merely to cheat investors out of their money.  Equity and good conscience demand that Defendants not be allowed to retain any of the funds they wrongfully converted.

85.     As a direct and proximate cause of Defendants' conduct, Plaintiffs, and members of the Class, suffered damages.

## COUNT V – COMMODITIES FRAUD UNDER SECTION 4(B) OF THE COMMODITIES EXCHANGE ACT AND REGULATION 1.1(B)
### (Against Sanchez, Baez and FIT New York)

86.     Plaintiffs, individually and on behalf of the Class, hereby incorporate by reference Paragraphs 1 through 85 as if set forth fully herein.

87.     Plaintiffs, individually and on behalf of the Class, bring this claim pursuant to Section 4b(a) of the Commodities Exchange Act, 7 U.S.C. § 6b(a)(2)(A)-(C), and Regulation

1.1(b) promulgated thereunder, 17 C.F.R. § 1.1(b), against Defendants Sanchez, Baez and FIT New York.

88.    Upon information and belief, Defendants Sanchez, Baez and FIT New York attempted to cheat or defraud, and in fact, cheated and defrauded clients through a Ponzi scheme based on purported foreign currency trading.  In addition, Defendants willfully attempted to deceive, and in fact deceived clients by, among other things, willfully falsifying reports and statements concerning the profitability of their investments and by misappropriating client funds.

89.    Defendants are equally liable for the similar violations of persons acting on their behalf, including the managers, employees, and agents of FIT who executed any part of their fraudulent scheme and efforts to deceive, under Section 2(a)(1)(b), 7 U.S.C. § 2(a)(1)(B) and Regulation 1.2, 17 C.F.R. § 1.2.

90.    This misconduct by Defendants was in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made or to be made, for or on behalf of other persons.

91.    As a direct and proximate cause of Defendants' misconduct, Plaintiffs, and members of the Class, suffered damages.

## COUNT VI – CONTROL PERSON LIABILITY UNDER SECTION 13(B) OF THE COMMODITIES EXCHANGE ACT
### (Against Sanchez and Baez)

92.    Plaintiffs, individually and on behalf of the Class, hereby incorporate by reference Paragraphs 1 through 91 as if set forth fully herein.

93.    Plaintiffs, individually and on behalf of the Class, bring this claim pursuant to Section 13(b) of the Commodities Exchange Act, 7 U.S.C. § 13c(b), against Defendants Sanchez and Baez.

94.     Defendants Sanchez and Baez acted as controlling persons within the meaning of Section 13(b) of the Commodities Exchange Act, 7 U.S.C. § 13c(b).  As directors, officers and majority shareholders, with direct supervisory and operational control, Defendants controlled FIT New York, FIT Switzerland and FIT Colombia, and knowingly induced, directly or indirectly, their violations of Section 4b(a) of the Commodities Exchange Act, 7 U.S.C. § 6b(a)(2)(A)-(C), and Regulations 1.1(b) promulgated thereunder, 17 C.F.R. § 1.1(b).

95.     As set forth above, FIT New York, FIT Switzerland and FIT Colombia violated Section 4b(a) by their deceptive, false and misleading actions as alleged.  As a consequence of their positions as controlling persons, Sanchez and Baez are liable for the actions of those entities or persons.

96.     As a direct and proximate cause of Defendants' conduct, Plaintiffs, and members of the Class, suffered damages.

### COUNT VII – VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") (Against all Defendants)

97.     Plaintiffs, individually and on behalf of the Class, hereby incorporate by reference Paragraphs 1 through 96 as if set forth fully herein.

98.     Defendants, Sanchez, Baez, FIT Corp. and FIT New York are persons within the meaning of 18 U.S.C. § 1961(3), as individuals or entities capable of holding a legal or beneficial interest in property.  FIT International Group ("FIT Group") is an enterprise within the meaning of 18 U.S.C. § 1961(4), as a group of individuals, including Defendants and corporate co-conspirators FIT Switzerland and FIT Colombia, among other corporate instrumentalities and other persons, associated in fact although not a legal entity.  FIT Group's activities are engaged in and affect interstate and foreign commerce.

23

99.     Upon information and belief, FIT Group was in fact a Ponzi scheme organized to solicit fraudulently the investment funds of clients for a purported investment in foreign currency, and to misappropriate those funds for the personal benefit and use of Defendants and their co-conspirators.  FIT Group solicited funds from clients throughout the United States and worldwide, executing its fraudulent activities principally in the states of New York and Florida and the countries of Switzerland and Colombia.

100.    Defendants were all employed by or associated with FIT Group and both conducted and participated, directly or indirectly, in the conduct of FIT Group's affairs through a pattern of racketeering activity over the course of several years from 2000 continually through 2009.

101.    Defendants Sanchez, Baez and FIT Corp. have engaged in repeated acts of bank fraud.  Defendants Sanchez, Baez and FIT Corp. solicited, collected and deposited substantial funds in bank accounts through JPMorgan and Bank of America on the false pretense of investing those funds in the Forex market.  Defendants Sanchez, Baez and FIT Corp. withdrew substantial amounts of money from those accounts for their own personal benefit and use rather than for the promised investments.

102.    Defendants Sanchez, Baez and FIT New York have engaged in repeated acts of mail and wire fraud.  In order to cover their misappropriation and misconduct, Defendants Sanchez, Baez and FIT New York sent through the mails and international wires false and misleading advertisements to clients to solicit funds, and produced false and misleading statements showing purported profits in Forex trading.

103.    In addition, Defendants conspired with each other and other co-conspirators to violate 18 U.S.C. § 1962(d).

104.    As a direct and proximate cause of Defendants' conduct, Plaintiffs, and members of the Class, have been injured in their business and property, and suffered damages.

## COUNT VIII – BREACH OF FIDUCIARY DUTY
### (Against Sanchez and Baez)

105.    In the alternative, and to the extent that Sanchez and Baez actually engaged in the purported transactions as claimed, their actions were a gross dereliction of the duties owed to Plaintiffs and members of the Class, and were such an extreme departure of the standard of care in the industry as to have been patently unreasonable and actionable.

106.    Plaintiffs, individually and on behalf of the Class, hereby incorporate by reference Paragraphs 1 through 64 as if set forth fully herein, insofar as they are not inconsistent with the allegations in Paragraph 105.

107.    Defendants Sanchez and Baez breached their duty of care to Plaintiffs, and the members of the Class, by engaging in a foreign currency exchange and holding positions without any protection against losses in a period of significant decline.  Defendants failed to sell those foreign currency positions at a reasonable and prudent time to prevent losses.  Defendants failed to put in place stop-loss or stop-limit orders to prevent unreasonable losses.  Defendants failed to purchase put options or sell futures contracts to limit exposure to unreasonable risks of loss in the foreign currency positions.

108.    As a direct and proximate cause of Defendants' conduct, Plaintiffs, and members of the Class, suffered damages.

## COUNT IX – NEGLIGENCE
### (Against Sanchez and Baez)

109.    Plaintiffs, individually and on behalf of the Class, hereby incorporate by reference Paragraphs 1 through 64 and 105 through 108 as if set forth fully herein, insofar as they are not inconsistent with the allegations in Paragraph 105.

110.    Defendants Sanchez and Baez marketed themselves as experts in the Forex market, investing in foreign currency. Defendants solicited funds for investment from Plaintiffs, and members of the Class, based on their expertise and promises concerning their investment approach and strategy. As a consequence, Defendants owed Plaintiffs, and members of the Class, a duty of reasonable care in the investment of their funds.

111.    Defendants materially breached their duty by investing in and holding open investments in foreign currencies in a period of significant decline. Defendants failed to exercise reasonable and prudent care to prevent and/or minimize any losses. In addition, Defendants failed to use reasonable methods to prevent losses in the investments.

112.    As a direct and proximate cause of Defendants' conduct, Plaintiffs, and members of the Class, suffered damages.

### **PRAYER FOR RELIEF**

WHERFORE, Plaintiffs demand judgment from the Court:

    a)    declaring this action to be a proper class action, and designating Kachroo Legal Services, P.C. as Class Counsel.

    b)    awarding the Class compensatory and punitive damages in an amount to be proven at trial, together with interest thereupon;

    c)    awarding the Class treble damages under RICO;

d)   awarding the Class their reasonable attorneys' fees, expenses, and costs incurred in connection with the institution and prosecution of this action; and

e)   awarding the class such other and further relief the Court deems just and appropriate under the circumstances.

## JURY DEMAND

Plaintiffs, individually and on behalf of the Class, demand a trial by jury on all issues so triable.

January 31, 2012

Respectfully submitted,

KACHROO LEGAL SERVICES, P.C.

By: Gaytri D. Kachroo
Dr. Gaytri D. Kachroo (GK2010)
John H. Ray, III (JR1177)
Kachroo Legal Services, P.C.
219 Concord Ave
Cambridge, MA 02138
(617) 864-0755
(617) 864-1125 (fax)
gkachroo@kachroolegal.com
jray@kachroolegal.com

*Attorneys for named Plaintiffs Manuel Bolivar, Andres Rubio and Janneth Quintero*