UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MANUEL BOLIVAR, JANNETH QUINTERO,
and ANDRES RUBIO, individually and on behalf
of all those persons similarly situated,

Plaintiffs,

-against-

FIT INTERNATIONAL GROUP CORP.,
FOREX INTERNATIONAL TEAM INC.,
JAIRO ENRIQUE SANCHEZ, and
DILIA MARGARITA BAEZ,

Defendants.

12cv781 (PGG) (DF)

**REPORT AND
RECOMMENDATION**

---

**TO THE HONORABLE PAUL G. GARDEPHE, U.S.D.J.:**

Currently before this Court for a report and recommendation is a damages inquest in a class action involving allegations of commodities law and racketeering violations. In short, plaintiffs Manuel Bolivar ("Bolivar"), Janneth Quintero ("Quintero"), and Andres Rubio ("Rubio"), and (collectively, "Plaintiffs" or "Class Representatives") have alleged that defendants FIT International Group Corp. ("FIT Corp."), Forex International Team Inc. ("FIT New York"), Jairo Enrique Sanchez ("Sanchez"), and Dilia Margarita Baez ("Baez") (collectively, "Defendants") orchestrated a 10-year Ponzi scheme, through which they defrauded a now-certified Class of approximately 600 investors of over $100 million. (*See generally* Dkt. 1 (Class Action Complaint, dated Jan. 31, 2012 ("Compl.")); Dkt. 33 (Order Certifying Class, dated Jan. 14, 2015 ("Class Cert. Order")).) Defendants have not appeared in this action, and are therefore in default. (Dkt. 38.)

As this Court has informed Plaintiffs throughout these proceedings, however, despite Defendants' default, it is Plaintiffs who bear the burden of establishing their claimed damages to

a reasonable certainty.  To avoid the harsh result of recommending that no damages be awarded to the Class, this Court has given Plaintiffs' – through Class Counsel – no less than *four* opportunities to carry this burden.  Further, at each juncture, this Court has provided detailed written and oral guidance to Class Counsel on how to improve Plaintiffs' inquest submissions. (*See* Dkts. 40, 44, 50, 51, 57.)  Although this Court's criticisms have, most recently, led Class Counsel to concede that the damages originally requested for the Class should be decreased by nearly $22 million, Class Counsel's latest inquest submissions introduce new, significant problems, and still lack the transparency and factual grounding that this Court has been demanding for months.  In the end, even that fourth round of inquest submissions are unduly speculative, and, in many respects, nonsensical.  They are certainly not adequate to justify the award of any particular sum as Class-wide damages.

For these reasons, and as discussed more fully below, I recommend that, rather than awarding any damages to the Class as a whole, the Court *sua sponte* decertify the Class due to the inadequacy of Class Counsel, and award damages only to the named Plaintiffs.  Specifically, I recommend that Plaintiff Bolivar, Quintero, and Rubio be awarded $213,539.51, $394,911.35, and $379,186.96, respectively, constituting treble damages under RICO, plus prejudgment interest on their out-of-pocket losses.  This recommendation is based upon evidence of damages unique to the named Plaintiffs, as discussed below.  I further recommend that Plaintiffs be awarded costs in the amount of $350.00.

## BACKGROUND

### A.  Factual Background

The facts set forth below are taken from Plaintiffs' Complaint.  In light of Defendants' default, Plaintiffs' factual allegations are deemed to be true.  (Dkt. 38 (Order of Default, dated

Oct. 8, 2015 ("Order of Default")), at 3; *see also Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009).)

### 1.    <u>The Ponzi Scheme</u>

Class Representatives Bolivar, Quintero, and Rubio are citizens of Florida who invested funds with Defendants because they believed that Defendants would use those funds to make trades on Plaintiffs' behalf and generate profit for them in the foreign currency trading market. (Compl. ¶¶ 1, 3, 9-11, 23, 31.)  The remaining Class Members are comprised of all other investors who (1) invested funds for trading in foreign currency with Defendants between January 1, 2000 and August 25, 2009, inclusive (the "Class Period"), and (2) suffered a net loss of their principal invested.  (*See* Class Cert. Order, at 3, 13.)  The Class includes approximately 600 investors, who are citizens of the United States, Colombia, Mexico, Panama, Peru, Spain, Italy, Germany, and Brazil, but excludes Defendants and "any entity in which the Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, immediate family members, heirs, successors, subsidiaries, and/or assigns of any such individual or entity." (*Id.*, at 3 n.1, 5, 11-13.)

Defendants Sanchez and Baez, who last resided in Bogota, Colombia, marketed themselves as experienced foreign currency trading experts.  (Compl. ¶¶ 12-13, 22-23.)  They informed potential investors that they made trades in the foreign currency trading market using a "proprietary" strategy, through their company, FIT Investment Group ("FIT Group").  (*Id.* ¶ 27.) Sanchez and Baez sometimes represented FIT Group to be a New York corporation, and, at other times, a New York limited liability company, but, in actuality, FIT Group was an unincorporated "sham" company, created by Sanchez and Baez "to avoid any legitimate enforceable contractual relationships [between Defendants and] investors."  (*Id.* ¶¶ 27-28, 33.)  Sanchez and Baez used a

company that they actually incorporated in New York, defendant FIT New York, as one of their "marketing and promotional" instrumentalities to solicit investors for FIT Group. (*Id.* ¶¶ 15, 27.) They also used a company that they incorporated in Florida, defendant FIT Corp., to open bank accounts with JP Morgan Chase, N.A. and Bank of America, N.A. in New York, for the purpose of "assuring investors that their money would be deposited into segregated accounts at . . . reputable United States bank[s]." (*Id.* ¶¶ 30, 33.)

Sanchez and Baez began collecting money from investors for their purported foreign currency trading operation on January 1, 2000. (*Id.* ¶¶ 1, 16, 34.) They targeted potential investors "throughout the United States and worldwide," focusing principally on New York, Florida, Colombia, and Switzerland. (*Id.* ¶ 99.) They solicited potential investors personally, through FIT New York, through their FIT companies in Colombia and Switzerland, and through social connections. (*Id.* ¶¶ 26-29.) One such social connection was a Colombian dentist named Mauricio Vasquez Uribe ("Uribe"), who hosted promotional meetings for potential investors on Sanchez's and Baez's behalf in Florida and Colombia. (*Id.* ¶ 29.) At these meetings, Uribe made presentations regarding FIT Group and its trading strategy, showed a video regarding FIT Group produced by Sanchez and Baez, showed attendees his investment statements from FIT Group and the profitable returns that he had supposedly received from his investments, and provided attendees with "fictitious, unenforceable trading agreements to sign." (*Id.* ¶ 30.)

In communicating with investors, Sanchez, Baez, and FIT New York made numerous misrepresentations through the "use of the mails" "international wires," and "other interstate facilities." (*Id.* ¶¶ 8, 102.) They told investors that their investments were protected because FIT Group "had stop loss measures in place to limit any negative losses on investments." (*Id.* ¶ 31.) They represented that FIT Group had all applicable and required government approvals, licenses,

and permits. (*Id.* ¶ 32.) They also assured investors that their accounts with FIT Group were segregated, that their trades would be "executed via the FIT account and FIT trading lines," and that an automated trading system was in places to distribute profits and losses. (*Id.* ¶ 33.) Additionally, they provided investors with falsified monthly investment statements, which showed "consistent, profitable monthly returns of approximately 3-4% over several years," and provided investors with internet access to their own purported monthly investment statements, which also showed consistent, profitable returns over time – even in times of "significant market volatility." (*Id.* ¶¶ 31, 36-37.) According to the Complaint, all of these promises and monthly statements were false because FIT Group did not, in fact, exist, and Defendants never actually invested money in foreign currency trading as they had promised. (*Id.* ¶¶ 33, 35.) Instead, Defendants "siphoned [investor money] away to secret private accounts . . . for their own purposes." (*Id.* ¶ 35; *see also id.* ¶ 60 ("Upon information and belief, Defendants also paid themselves and friends, and misappropriated substantial amounts of funds to other ventures, including Swiss, Panamanian and Colombian front companies controlled by Sanchez and Baez").)

### 2. The Unraveling of the Ponzi Scheme

Over time, the number of new investors into Defendants' scheme decreased and withdrawals and redemptions by existing investors increased. (*Id.* ¶ 38.) These changes caused Defendants to "deposit over $6 million back into the FIT Corp. operating account at Bank of America to continue meeting withdrawals and redemptions." (*Id.*) Uribe grew suspicious of Defendants' operations around that time, began warning other investors to pull their money out of FIT Group, and even visited Defendants' New York offices, only to find those offices empty. (*Id.*) On December 1, 2008, Uribe redeemed his entire $2,269,655.65 investment from FIT

Group.  (*Id.*)  As investors began questioning Sanchez and Baez regarding Uribe's warnings, Sanchez and Baez "publicly expressed outrage" and "claim[ed] to investors that they were operating a legitimate enterprise, and that investors' money would be available to them at any time."  (*Id.* ¶ 39.)

The following month, FIT Group released financial statements with "uncharacteristically low, but still positive returns," and then, in February 2009, it reported its first-ever loss.  (*Id.* ¶¶ 42-43.)  Investors began requesting that their investments be returned to them, and, in response, FIT Group suspended investor withdrawals and redemptions for the first time.  (*Id.* ¶¶ 44-45.)  In March 2009, FIT Group reported "catastrophic losses of purportedly as much as 70% and 80% to investor accounts."  (*Id.* ¶ 47.)  According to the Complaint, however, the timing of these losses was "too perfect to be legitimate," and the losses were, in reality, manufactured on paper after the fact as part of Sanchez and Baez's "exit" plan.  (*Id.* ¶¶ 39, 48-57.)  After these losses were reported, investors demanded information to verify that the purported transactions had actually taken place.  (*Id.* ¶ 59.)  In response, Defendants were unable to produce records of their purported trades.  (*Id.*)

Legal action was reportedly instituted against Defendants in Florida, and, on August 25, 2009, FIT Corp. "executed an assignment for the 'benefit' of creditors" in Florida State Court under Florida Statutes, Chapter 727,[1] through which it claimed that it was "unable to pay its debts as they became due."  (*Id.* ¶ 61.)  At that time, FIT Corp. reported having only $12,690.74

---

[1] "In an assignment for the benefit of creditors, the debtor voluntarily assigns its assets to a third party as trustee for the purpose of liquidating the assets to satisfy, in full or in part, creditors' claims against the debtor.  . . .  An assignment for the benefit of creditors is an alternative to bankruptcy . . . [and] is seen as a cooperative effort which can benefit creditors by affording prompt and relative inexpensive resolution of claims."  *Moecker v. Antoine*, 845 So. 2d 904, 910 (Fla. Dist. Ct. App. 2003) (citations and footnote omitted).

in its various bank accounts, despite having collected over $100 million from investors since January 1, 2000. (*Id.*; *see also id.* ¶ 34.) Its JP Morgan account was documented as having been closed as of May 29, 2009, and its Bank of America accounts, altogether, contained less than $7,500. (*Id.* ¶ 62.) At a November 20, 2009 hearing in the assignment proceedings, Sanchez and Baez appeared on behalf of FIT Corp. in order to "answer the unresolved questions concerning their investment activity and to account for client funds." (*Id.* ¶ 64.) Sanchez and Baez did not, however, provide substantive answers to any questions asked, but instead "pleaded their Fifth Amendment right against self-incrimination" in response to every question. (*Id.*)

    **B.**     **Procedural History**

        **1.**     **The 2010 Lawsuit**

Plaintiffs, represented by Gaytri D. Kachroo, Esq. ("Kachroo") of Kachroo Legal Services, P.C. (the "Kachroo Firm"), first brought this lawsuit on March 10, 2010. (*See Bolivar et al. v. FIT Int'l Group Corp. et al.*, No. 10cv2128 (PGG) ("*Bolivar I*"), Dkt. 1 (Complaint, dated Mar. 10, 2010 ("*Bolivar I* Compl.")).) At that time, Plaintiffs filed a Complaint that was, in material respects, identical to the Complaint filed in this case. (*See infra.*) Plaintiffs asserted claims for fraud, breach of fiduciary duty, conversion, unjust enrichment, violations of the Commodities Exchange Act ("CEA"), violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and negligence. (*Bolivar I* Compl. ¶¶ 65-112.) As in this case, FIT Corp. and FIT New York never appeared, despite being served. (Bolivar I, Dkts. 2-3 (Affidavits of Service).) Unlike in this case, however, Defendants Sanchez and Baez were never served. Although the Kachroo Firm filed a Motion for Service Abroad on January 6, 2011 on behalf of Plaintiffs in order to effectuate service on Sanchez and Baez, the "type face in [that] motion [was] too small to be legible, and the motion reference[d] exhibits that [were] not

attached." (*Bolivar I*, Dkt. 17 (Order of Dismissal, dated Aug. 22, 2011 ("8/22/11 Order of Dismissal")), at 2.)  Judge Gardephe's Chambers informed the Kachroo Firm of these deficiencies and asked it to file a corrected motion, but the Kachroo Firm did not do so.  (*Id.*)

The Kachroo Firm did, however, request six adjournments of the initial pretrial conference.  (*Bolivar I*, Dkt. 16 (Order, dated July 14, 2011 ("7/14/11 Order to Show Cause")).)  In one request for adjournment, dated February 8, 2011, the Kachroo Firm stated that it had "engaged an accountant team to conduct a forensic analysis on the bank records obtained concerning the Defendants," and that, once that work was completed, Plaintiffs would have "sufficient evidence of damages to support a request for default judgment."  (*Bolivar I*, Dkt. 13 (Letter from Gaytri D. Kachroo, Esq. to the Court, dated Feb. 8, 2011 ("2/8/11 Kachroo Ltr.")).)  On April 6, 2011, apparently having realized that it should have attempted to obtain an order certifying the putative class before filing a motion for default judgment, the Kachroo Firm requested an extension on Plaintiffs' motion for default judgment so that it could first file and receive a ruling on a motion for class certification.  (*Bolivar I*, Dkt. 14 (Letter from Gaytri D. Kachroo, Esq. to the Court, dated Apr. 6, 2011).)  Judge Gardephe granted the Kachroo Firm's request, but the Kachroo Firm never filed a motion for class certification.  (8/22/11 Order of Dismissal, at 2.)

After the Kachroo Firm failed to call Judge Gardephe's Chambers for a scheduled telephonic conference on July 13, 2011, Judge Gardephe issued an Order to Show Cause by July 29, 2011 why the case should not be dismissed for failure to prosecute.  (7/14/11 Order to Show Cause.)  The Kachroo Firm did not respond "in any fashion" to Judge Gardephe's Order.  (8/22/11 Order of Dismissal, at 4.)  Accordingly, on August 22, 2011, Judge Gardephe dismissed the Complaint in its entirety for failure to prosecute.  (*Id.* at 3-6.)

The Kachroo Firm subsequently moved to vacate the Judge Gardephe's Order of

Dismissal, on the ground that its conduct throughout the case constituted "excusable neglect."

(*Bolivar I*, Dkt. 18 (Motion to Vacate Order of Dismissal, dated Sept. 28, 2011), at 8.)

Judge Gardephe denied that motion on January 23, 2012, reasoning that "there was no 'excusable

neglect'" under the circumstances, but rather a "complete lack of diligence" on the part of the

Kachroo Firm, involving:

> numerous requests for adjournments; submission of illegible and
> incomplete papers; failure to submit corrected papers;
> misrepresentations to the Court as to when motions would be filed;
> failure to respond to Court orders; and failure to properly monitor
> the docket for many months.

(*Bolivar I*, Dkt. 23 (Order, dated Jan. 23, 2012), at 5, 8.)

## 2. Plaintiffs' Re-Filed Lawsuit

After their initial lawsuit was dismissed, Plaintiffs re-filed their Complaint on

February 1, 2012, asserting the same nine claims against Defendants as they had asserted before:

(1) fraud; (2) breach of fiduciary duty; (3) conversion; (4) unjust enrichment; (5) commodities

fraud under Section 4(b) of the CEA, 7 U.S.C. § 6b(a)(2)(A)-(C), and Commission

Regulation 1.1(b), 17 C.F.R. § 1.1(b)[2]; (6) control person liability under Section 13(b) of the

CEA, 7 U.S.C. § 13c(b); (7) violation of RICO, 18 U.S.C. § 1961 *et seq.*; (8) breach of fiduciary

---

[2] Section 1.1(b) of Title 17 of the Code of Federal Regulations was "removed and reserved" in 2010. *See* Regulation of Off-Exchange Retail Foreign Exchange Transactions & Intermediaries, 75 Fed. Reg. 55410, 55418 (Sept. 10, 2010). As the events giving rise to the Complaint occurred between January 1, 2000 and August 25, 2009 (*see* Compl. ¶ 1), however, this Court construes Plaintiffs' claim under 17 C.F.R. § 1.1(b) as a claim under the regulation as it existed during that timeframe. *See United States v. FJN Contractors, Inc.*, No. 08cv1065, 2009 WL 3219039, at *3 n.4 (W.D. Ark. Sept. 30, 2009). During the relevant time period, the regulation declared fraud "in or in connection with transactions in foreign currency subject to the [CEA]" to be unlawful. *See* 17 C.F.R. § 1.1(b) (2009); *see also* A New Regulatory Framework for Trading Facilities, Intermediaries and Clearing Organizations, 66 Fed. Reg. 42256-01, 42269 (Aug. 10, 2001).

duty; and (9) negligence.  (*See* Compl. ¶¶ 65-112.)  Plaintiffs asserted the first and fifth claims

against Sanchez, Baez, and FIT New York; the second and third claims against Sanchez, Baez,

and FIT Corp.; the fourth and seventh claims against all Defendants; and the sixth, eighth, and

ninth claims against Sanchez and Baez.  (*See id.*)  As relief, Plaintiffs sought compensatory and

punitive damages, interest, treble damages under RICO, and attorneys' fees, expenses, and costs.

(*Id.* at 26-27 (Prayer for Relief).)

Plaintiffs served defendants FIT Corp. and FIT New York with the Summons and

Complaint, and filed affidavits of service on March 28, 2012.  (Dkts. 4-5.)  Neither defendant

responded to the Complaint or otherwise appeared.

Over nine months later, on January 22, 2014, Plaintiffs filed a motion to serve defendants

Sanchez and Baez by publication in Colombia.  (Dkt. 9 (Motion Pursuant to Fed. R. Civ.

P. 4(f)(3) for Order Allowing Service on the Foreign Defendants to be Made by Publication).)

Judge Gardephe granted that motion (Dkt. 15), and Plaintiffs filed proof of service as to Sanchez

and Baez on August 27, 2014 (Dkt. 21 and exhibits).  Neither Sanchez nor Baez then responded

to the Complaint or otherwise appeared.

On September 18, 2014, the Clerk of Court issued a Certificate of Default as to all four

defendants.  (Dkt. 24.)

On October 31, 2014, Plaintiffs moved for class certification (Dkt. 28), which

Judge Gardephe granted on January 14, 2015.  (Class Cert. Order.)  In that Order, Judge

Gardephe appointed Plaintiffs Bolivar, Rubio and Quintero as Class Representatives, and the

Kachroo Firm as Class Counsel.  (*Id.*, at 13.)

On July 27, 2015, Judge Gardephe issued an Order stating that, "[o]ver the past six

months, individuals at Kachroo Legal Services [had] represented to the Court multiple times via

telephone that Plaintiffs intended to file a motion for default judgment," but "[had] not taken any action before the Court in this case since the January 14, 2015 Order." (Dkt. 34 (Order, dated July 27, 2015).) Judge Gardephe ordered Plaintiffs to file a motion for default judgment within 14 days, and stated that, if they did not do so, he would dismiss the case for failure to prosecute. (*Id.*)

Plaintiffs complied with Judge Gardephe's Order, and Judge Gardephe issued an Order to Show Cause directed at Defendants, ordering them to appear at a September 10, 2015 hearing to show cause "why the Court should not enter a default judgment against all Defendants pursuant to Federal Rule of Civil Procedure 55(b)." (Dkt. 35 (Order to Show Cause for Entry of Default Judgment Against All Defendants).) Defendants did not appear for that hearing or otherwise communicate with the Court. (Dkt. 38 (Order of Default), at 3.) Accordingly, Judge Gardephe issued an Order of Default on October 8, 2015, and referred this case to this Court for a damages inquest. (*Id.*; *see also* Dkt. 39 (Order of Reference).) Through the Order of Default, Judge Gardephe expressly "accept[ed] as true the factual allegations in the Class Action Complaint against the Defendants who have defaulted in this action." (Order of Default, at 3.)

### 3. **Plaintiffs' Various Inquest Submissions**

On October 20, 2015, this Court ordered that Plaintiffs file and serve Proposed Findings of Fact and Conclusions of Law concerning damages. (Dkt. 40 (Scheduling Order for a Damages Inquest).) This Court stated that Plaintiffs' submissions

> should specifically tie the proposed damages figure(s) to the legal claim(s) on which liability has now been established; should demonstrate how Plaintiffs have arrived at the proposed damages figure(s); and should be supported by an affidavit that attaches as exhibits and contains an explanation of any documentary evidence that helps establish the proposed damages.

(*Id.* ¶ 2.) This Court also provided Defendants with an opportunity to respond to Plaintiffs' submissions, and cautioned Defendants that, if they failed to respond or contact this Court's chambers to request an in-court hearing, this Court would issue a report and recommendation concerning damages on the basis of Plaintiffs' written submissions alone. (*Id.* ¶ 3.)

Since this Court's issuance of that Order, Plaintiffs' have made several inquest submissions, as described below.

### a.     **Plaintiffs' First Set of Inquest Submissions**

Plaintiffs filed their initial inquest submissions on November 20, 2015. (Dkt. 41 (Plaintiffs' Proposed Findings of Fact and Conclusions of Law Relating to an Assessment of Damages, dated Nov. 20, 2015 ("Pl. Proposed Findings")); Dkt. 42 (Affidavit of Gaytri Kachroo, Esq., dated Nov. 20, 2015 ("11/20/15 Kachroo Aff.")) and exhibits attached thereto).) These submissions included a memorandum (Pl. Proposed Findings), an affidavit from Class Counsel (Dkt. 42), one-page letters from individuals at JP Morgan Chase and Bank of America responding to Class Counsel's subpoenas for bank records (Dkt. 42-4), four pages of spreadsheets purportedly summarizing deposit and withdrawal activity in JP Morgan Chase and Bank of America bank accounts in the name of defendants FIT Corp. and Baez from 2003 to 2009 (Dkts. 42-5, 42-6 ("11/20/15 Damages Spreadsheets")), and declarations from two of the Class Representatives, Rubio and Quintero, asserting that they had lost their entire investments with Defendants (Dkt. 42-7, at 2-4 (Declaration of Andres Rubio, dated Nov. 17, 2015

("11/17/15 Rubio Decl."); *id.* at 5-7 (Declaration of Janneth Quintero, dated Nov. 2015[3] ("11/15 Quintero Decl.").)  Plaintiffs' counsel also filed proof of service, representing that each of these documents had been served on Defendants.  (Dkt. 43.)

Although Plaintiffs cited law in their memorandum suggesting that they were entitled to "out-of-pocket" pecuniary losses for their fraud and RICO claims, they stated that they had instead computed damages from the dollar amounts of "withdrawals [from the JP Morgan and Bank of America bank accounts] by the Defendants into their own accounts or accounts under their control."  (Pl. Proposed Findings, at 8.)  In total, Plaintiffs asserted that the Class had sustained damages in the amount of $57,858,795.56 in "theft of investment funds," $81,797,604.20 in interest from January 1, 2000 through October 8, 2015, and $455.00 in costs, for a total of $139,656,854.70.  (*Id.*, at 9.)  Despite requesting treble damages and attorneys' fees in their Complaint, Plaintiffs did not make clear whether they were seeking either on this inquest. Plaintiffs did, however, expressly seek post-judgment interest pursuant to 28 U.S.C. § 1961.  (*Id.*, at 10.)  Defendants never responded to Plaintiffs' submissions.

After reviewing Plaintiffs' submissions, this Court issued an Order providing Plaintiffs with an opportunity to make supplemental filings.  (Dkt. 44 (Order, dated Sept. 13, 2016 ("9/13/16 Order")).)  In that Order, this Court informed Plaintiffs that, despite Defendants' default, Plaintiffs still had the burden of demonstrating their claimed damages with admissible evidence and to a reasonable certainty, which they had not done.  (*Id.*, at 1-2.)  First, this Court noted that Plaintiffs had failed to provide sufficient foundational testimony connecting their damages spreadsheets with the evidence that the spreadsheets purportedly summarized.  (*Id.*, at 3.)  This Court pointed out that, although Class Counsel stated in her affidavit that damages

---

[3] No specific date in November is provided.

were computed "[a]s a result" of an "audit review" conducted by "accounting and forensic personnel" (11/29/15 Kachroo Aff. ¶ 29), Plaintiffs had not set forth the identities of those accounting or forensic personnel, their qualifications, their methodology, or their ability to confirm the accuracy of the damages computations (9/13/16 Order, at 2-3).  Second, this Court noted that Plaintiffs had not only failed to demonstrate that their summary spreadsheets were supported by underlying bank records, but had also offered no evidence to demonstrate that the bank statements presumably used to compile the spreadsheets constituted "business records" or were otherwise admissible, such that the Court could consider Plaintiffs' summaries.  (*Id.*, at 2-5.)  Third, this Court indicated that Plaintiffs had failed to demonstrate the relevance of Baez's bank-account activity, given the absence of any allegations in the Complaint or the Class Representative Declarations that any investor money had ever gone into Baez's bank accounts, as opposed to FIT Corp.'s bank accounts.  (*Id.*, at 5.)  Finally, this Court asked Plaintiffs to clarify whether they were seeking treble damages under RICO or attorneys' fees, given that they had sought such relief in their Complaint, but did not mention either in their inquest submissions.  (*Id.*, at 6.)

This Court afforded Plaintiffs 30 days to make any supplemental filings addressing the deficiencies the Court had identified, and gave Defendants 30 days thereafter to respond.  (*Id.*, at 7.)

### b.      Plaintiffs' Second Set of Inquest Submissions

On October 12, 2016, Plaintiffs made a supplemental filing, which included two bankers' boxes delivered directly to the Court, filled with thousands of pages of the JP Morgan and Bank of America bank statements, dated May 2003 to September 2009.  The supplemental filings also included a memorandum (Dkt. 45 (Plaintiffs['] Supplement to Address Deficiencies in the

Inquest Submission, dated Oct. 11, 2016 ("Pl. Supp. Mem.")); a declaration from Class Counsel (Dkt. 45-4 (Declaration of Gaytri Kachroo, Esq., dated Oct. 11, 2016 ("10/11/16 Kachroo Decl.")); a declaration from the custodian of records at JP Morgan Chase, N.A. (Dkt. 45-5 (Declaration of Andy Ramirez, dated Oct. 5, 2016 ("Ramirez Decl.")); an affidavit from the custodian of records at Bank of America N.A. (Dkt. 45-6 (Affidavit of Jorge Salas, sworn to Apr. 15, 2010 ("Salas Aff.")); a declaration from the accountant whose firm computed Plaintiffs' damages (Dkt. 45-7 (Declaration of Adam Apak, dated Oct. 11, 2016 ("10/11/16 Apak Decl.")); and two pages of updated damages spreadsheets (Dkt. 45-8 ("10/12/16 Damages Spreadsheets")).  Defendants never responded to these submissions, despite being served with the electronically filed documents and notified that the hard-copy documents were available for inspection at this Court.  (Dkt. 45-10 (Affirmation of Service).)

Through their supplemental submissions, Plaintiffs revised their compensatory damages by nearly a million dollars, up to $58,706,074.22, apparently due to a "minor arithmetic error" (Pl. Supp. Mem., at 11; 10/11/16 Apak Decl. ¶ 16); argued that the Ramirez Declaration, Salas Affidavit, and Apak Declaration sufficiently authenticated and made admissible their damages spreadsheets (Pl. Supp. Mem., at 2-7); clarified that they were not seeking attorneys' fees, but were, in fact, seeking treble damages under RICO (*id.*, at 7-8); and noted that their previous reference to Baez's bank accounts "served no purpose" (*id.*, at 7).  Plaintiffs also attempted to clarify their methodology for computing damages.  They stated that they had focused on the FIT Corp. bank accounts in which Class Members had deposited investment funds.  (10/11/16 Apak Decl. ¶ 2.)  They then examined all withdrawals from those FIT Corp. accounts, and characterized each withdrawal as one of the following:  (1) a withdrawal sent back to an investor; (2) a withdrawal sent to one of Defendants' "own personal bank accounts [or] into accounts that

they controlled"; or (3) a "miscellaneous expense . . . not disbursed or withdrawn into the bank accounts of Defendants nor redeemed by the Class of investors." (10/11/16 Kachroo Decl. ¶¶ 17, 32; 10/11/16 Apak Decl. ¶¶ 5-14.) According to Plaintiffs, investors received $78,910,297.49 in withdrawals, Defendants received $58,706,074.22 in withdrawals, and "miscellaneous expenses" not counted towards damages totaled $8,155,616.94. (10/11/16 Kachroo Decl. ¶¶ 31-32.) The $58,706,074.22 in withdrawals purportedly sent to Defendants and accounts under their control constituted Plaintiffs' "theft of investment funds" damages. (*See* 10/11/16 Kachroo Decl. ¶¶ 7, 17, 28, 31; 10/11/16 Apak Decl. ¶¶ 5-14; Pl. Supp. Mem., at 7.) Plaintiffs further described the Defendant accounts that received these allegedly illicit funds as belonging to "various third party companies or companies established and incorporated by Sanchez and Baez in various international jurisdictions" (10/11/16 Kachroo Decl. ¶¶ 3, 28), "bank accounts of sham companies and accounts under the control of Baez" (10/11/16 Apak Decl. ¶¶ 11, 16), and "accounts opened by Defendants in the name of sham corporations" (Pl. Supp. Mem., at 7). Plaintiffs offered no explanation as to how they determined which accounts were investor accounts and which were accounts under Defendants' control. Nor did Plaintiffs offer any explanation as to how they determined which withdrawals were "miscellaneous expenses."

As in their prior submission, Plaintiffs contended that prejudgment interest was properly calculated from January 1, 2000 through October 8, 2015 (*id.*, at 11), and ultimately sought $176,118,222.65 in trebled "theft of investment funds" damages; $248,833.335.33 in prejudgment interest; and $455.00 in costs, for a total of $424,952,012.98 (*id.*, at 12).

In order to better understand Plaintiffs' methodology and verify Plaintiffs' damages computations, this Court reviewed a sample of the bank records underlying Plaintiffs' damages

claims, which had been provided to the Court for the first time in Plaintiffs' supplemental submissions. (Dkt. 50 (Order, dated Dec. 6, 2016 ("12/6/16 Order")), at 8.) The sample selected by this Court was comprised of seven months of bank records corresponding to the months in which Plaintiffs sought the largest amount of damages for each year in their damages period: June 2003, August 2004, May 2005, January 2006, November 2007, December 2008, and January 2009. (*Id.*, at 8-9.) After review of these bank records, together with Plaintiffs' other supplemental submissions, this Court issued an Order in which it identified two potentially substantial deficiencies in Plaintiffs' submissions: (1) Plaintiffs' damages computation had apparently inflated Plaintiffs' compensatory damages amount by several million dollars by failing to account for deposits made by Defendants, and (2) Plaintiffs had failed to provide any factual support for their assertion that certain withdrawals were sent to accounts under Defendants' control (*id.*, at 8-16).

In explaining the apparent inflation of compensatory damages, this Court used Plaintiffs' claimed damages for May 2005 as an example. In Plaintiffs' supplemental inquest submissions, May 2005 was the month in which Plaintiffs had sought the largest amount of damages in the entire 2003 to 2009 time period – specifically, $5,067,876.75. (*See* 10/12/16 Damages Spreadsheets, at 1.) From this Court's review of the May 2005 bank records, however, it appeared that Plaintiffs had overstated their damages for May 2005 by at least $5 million because $5 million in withdrawals from the subject FIT Corp. account, which Plaintiffs had counted towards damages, were sent to two particular accounts that had also collectively *deposited* $5,499,979.49 into that same FIT Corp. account in that same month. (12/6/16 Order, at 10-12.) In other words, it appeared that there had been a circular movement of funds, and that Plaintiffs may have been ignoring deposits, in deriving their damages solely from the amount of

withdrawals. (*Id.*) It turned out that one of the accounts that had made substantial deposits in the subject FIT Corp. account was clearly identified in the bank records as FIT Corp.'s money-market account, and that the other depositing account was an unidentified account under the name "Ubs Ag," which Class Counsel would later represent belonged to Defendants. (*Id.*) As the FIT Corp. bank records thus suggested that, in calculating their damages, Plaintiffs may have failed to net out, from Defendants' ill-gotten gains, Defendants' own infusions of funds *into* investor accounts (infusions that were perhaps made for the purpose of injecting temporary liquidity into their Ponzi scheme so as to meet potential investor redemptions (*see* Compl. ¶ 38)), this Court provided Plaintiffs an opportunity to further explain the issue and potentially provide evidence that that circulated money was stolen from the Class in the first instance. (12/6/16 Order, at 10-12.)

Next, this Court discussed Plaintiffs' failure to explain their factual basis for asserting that certain accounts that received money from the subject FIT Corp. accounts were indeed Defendants' accounts or accounts under their control. (*Id.*, at 12-15.) As noted, Plaintiffs did not provide this Court with any explanation as to how they determined which withdrawals from the FIT Corp. accounts were sent to investors and which were sent to Defendants and their supposed sham companies. For that reason, this Court endeavored to understand Plaintiffs' methodology for determining which accounts were investor accounts and which were Defendant-controlled accounts by attempting to back into Plaintiffs' damages computations for certain months.

Following pencil marks that this Court assumed were made by Plaintiffs' counsel or their accountants in the bank records, this Court was able to duplicate Plaintiffs' damages computations precisely, for several months. (*See id.*, at 12-14.) In doing so, this Court

determined that Plaintiffs had, for the most part, assumed that all withdrawals sent to natural

persons besides Sanchez and Baez were sent to investors, and all other withdrawals – *i.e.*, those

sent to corporate entities – were sent to Defendants or their supposed sham companies.  (*Id.*)[4]

Upon a review of only two months of bank records, however, withdrawals sent to corporate

entities included withdrawals sent to a wide range of entities without any apparent relationship to

Defendants, including:  Cds Creditos De Seguros, Vaugirard S.A., Scb International Consulta,

Cgc Ltda Inc., Hesperia Overseas S.A., Newtown Overseas, Crensal Trading S.A., Semar

Internacional, Garota Holdings, Standford Int. Bank Ltd., Central Foundation, and Compliance

Consulting Group.  (*Id.*, at 13-14.)  None of these entities were mentioned by name in the

Complaint or in any of Plaintiffs' other submissions; at least a couple had deposited money into

the subject FIT Corp. accounts; and one entity had even apparently filed a lawsuit against

Defendants in this District.  (*Id.*, at 14 (citing *Zamora et al. v. JP Morgan Chase Bank N.A. et al.*,

No. 14cv5344 (WHP), in which CGC, Inc. was a named plaintiff and FIT Corp., FIT New York,

Sanchez, and Baez were named defendants).)  This Court noted that, given Plaintiffs' request for

treble damages and prejudgment interest, even if they were wrong about only a few of these

---

[4] Indeed, despite Plaintiffs' having asserted that they had excluded "miscellaneous expenses" from their damages computation, Plaintiffs did not, for the sample months that this Court examined, exclude from their computation expenses the itemized "account analysis fees" (*see id.*, at 12, n.8), which, based on the bank statements themselves, were fees charged by JP Morgan (*see* Pl. Supp. Mem., Ex. 11 (submitted to the Court in hard-copy form only)).  As discussed below, Plaintiffs would later remove these fees from their damages computation, as well as certain other "fees" that may, or may not, have actually represented Defendants' business expenses.  In particular, this Court notes that Plaintiffs originally assumed that payments made to "Jade Residences" represented unlawfully withdrawn funds, but later decided that such payments should not be included in their damages computation.  It is unclear to this Court why Plaintiffs changed their view as to those particular expenditures, as Jade Residences was apparently the owner of Defendants' condominium, to which Defendants paid rent.  (*See* Dkt. 52 (Declaration of Gaytri Kachroo, Esq., dated Feb. 16, 2017 ("2/16/17 Kachroo Decl.")), Ex. 19, at 6 (page submitted only in hard-copy form, without explanation).)

companies being Defendants' sham companies, their damages claim would be inflated by millions of dollars.  (*Id.*, at 15.)

In light of these unexplained issues, this Court found that Plaintiffs had again failed to establish their asserted damages award to a reasonable certainty.  (*Id.*, at 16.)  Although this Court concluded that the Ramirez Declaration and Salas Affidavit were sufficient to demonstrate the admissibility and authenticity of the bank records under Rules 803(6) and 902(11) of the Federal Rules of Evidence (*id.*, at 8 n.5), this Court determined that Plaintiffs' supplemental submissions had raised new questions regarding the reliability of Plaintiffs' damages computations, and set a date of January 11, 2017 for an evidentiary hearing (*id.*, at 16).  This Court ordered that Plaintiffs present one or more witnesses to explain their documentary evidence and damages computation at the hearing.  (*Id.*)  Notice of this Court's Order and the January 11, 2017 hearing was served on Defendants.  (Dkt. 48 (Affirmation of Service).)

### c.     The January 11, 2017 Evidentiary Hearing and Plaintiffs' Third Set of Inquest Submissions

This Court held an evidentiary hearing on Plaintiffs' damages claims on January 11, 2017 (the "1/11/17 Hearing").  Plaintiffs' counsel, Kachroo, and accountant Adam Apak ("Apak") appeared on behalf of Plaintiffs, and no one appeared on behalf of Defendants.  (*See* Dkt. 57 (Transcript of Hearing held on Jan. 11, 2017 ("Tr.")), at 2.)  At the beginning of the hearing, Kachroo submitted two exhibits to the Court, marked as Plaintiffs' Exhibits 1 and 2 ("Pl. Hr'g Ex. 1" and "Pl. Hr'g Ex. 2").  The first exhibit was revised damages spreadsheet, and the second exhibit was a written statement from Kachroo – partially handwritten and partially typed in several different font sizes – setting out Plaintiffs' new claimed damages award.  (*See* Tr. at 4-5.)  These exhibits effectively constituted Plaintiffs' third set of inquest submissions.

Acknowledging that they should not have counted the circular movement of funds in and out of Defendants' accounts towards their damages that this Court had identified in the 12/6/16 Order, Plaintiffs new submissions decreased their claimed damages amount to $40,711,698.63 – approximately $17 million less than they had previously requested. (*Id.* at 3; *see also* Pl. Hr'g Ex. 2, at 2.) This decreased damages amount also subtracted out "company expenses" in the amount of $1,126,114.19 that were "made to third parties for services like accounting, legal corporate, bank fees, etc." (*Id.* at 1-2; Tr. at 26.) Plaintiffs also shortened the period from which they were seeking prejudgment interest from January 1, 2000 to October 8, 2015, to June 14, 2003 to October 8, 2015, on the basis that they had not submitted any evidence prior to June 14, 2003. (Pl. Hr'g Ex. 2, at 2; Tr. at 44-45.) Including treble damages and prejudgment interest, Plaintiffs sought $167,308,350.53 in total, in their new damages submissions. (Pl. Hr'g Ex. 2, at 2, 4.)

At the hearing, this Court placed both Kachroo and Apak under oath and elicited testimony from both regarding Plaintiffs' damages claims, with particular focus on the two issues raised in the 12/6/16 Order. (*See* Tr. at 4, 12.) With regards to the apparently circular movement of $5 million in funds in May 2005 that this Court had discussed, Kachroo agreed that the $5 million should not have been counted towards Plaintiffs' damages. (*Id.* at 14-15, 39-40.) She testified that, in light of this concession, she had instructed Apak that such funds should be considered "circulated money" and should be "zeroed out." (*Id.* at 14-15; *see also id.* at 38-40.) Despite acknowledging that the Court was correct that "circulated money" should not be counted towards damages, Apak testified that, in Plaintiffs' new damages submissions, he had only deducted $2.5 million from Plaintiffs' damages for the month of May 2005. (*Id.* at 15-17.) When asked why he did not deduct the entire $5 million in circulated money, Apak stated that he

did not deduct $2.5 million that came from Defendants' money-market account and went back into that same money-market account because he had believed that the two accounts were "different" due to different numerical suffixes that appeared next to the funds transfers in the bank records. (*Id.* at 16; *see also id.* at 23-24.) This Court then showed Apak the bank records, and Apak admitted, on the stand, that he had made a mistake in assuming that the accounts were different. (*Id.* at 17.) Referring to the $2.5 million that went back and forth between Defendants' money-market account, Apak testified to the Court, "You're right. I think right now, once you point it out, it should be netted out." (*Id.*)

Given this acknowledged error, this Court stated:

> Here in this one month, you're inflating damages by, call it, $2.5 million, and multiplying that by three, now you're at $7.5 million. I have no idea over the years how many times you did this or your accountants did this.

(*Id.* at 25.) In response, Kachroo requested additional time to remedy the error. (*Id.* at 26.)

This Court also questioned Kachroo and Apak regarding how they determined which accounts appearing in the FIT Corp. bank records belonged to investors and which belonged to or were controlled by Defendants. (*Id.* at 7.) Both explained that they had relied, in part, on an investor list that Kachroo had received from the assignor in a Florida bankruptcy proceeding involving FIT Corp. (*Id.* at 7-8, 30-34.) Upon being questioned by the Court, though, Apak acknowledged that there were individuals and entities that had deposited money into FIT Corp.'s accounts that were not on the Florida bankruptcy investor list. (*Id.* at 34.) He further testified that, when he would see such an individual or entity making deposits into a FIT Corp. account, he would ask Kachroo how to classify the depositor. (*Id.*) He explained that Kachroo told him

to assume that all deposits made into the FIT Corp. accounts were made by investors. (*Id.* at 35-38.)[5]

Kachroo testified that she had, in fact, assumed that any entity not on her investor list was a Defendant-controlled entity, with the exception of third-party entities that were "well known." (*Id.* at 40-41.) She provided the examples of "Paychex," a purported "payroll service" company, and the Florida Department of Treasury, as entities that she did not assume were Defendant-controlled entities. (*Id.*) She further testified that withdrawals sent to Paychex and the Florida Department of Treasury, along with "account analysis fees," were not included in damages because they fell within the "company expense" category of withdrawals. (*Id.* at 40-41; *see also id.* at 26.) When asked about CGC Limited, which, as noted in the 12/6/16 Order, had apparently filed a lawsuit against Defendants, Kachroo acknowledged that including that entity as a Defendant-controlled entity "was an error that was made." (*Id.* at 9-10.) Kachroo also testified, without any explanation as to the basis of her knowledge, that UBS Ag – another entity

---

[5] Apparently in defense of her initial assumption that all deposits to the FIT Corp. accounts were made by investors, Kachroo stated that, at a hearing in the Florida bankruptcy case, Defendants "were in fact asked" whether they deposited any funds into the JP Morgan and Bank of America accounts at issue "and they took the Fifth." (*Id.* at 9.) Kachroo repeated this assertion in her Declaration, dated February 16, 2017, and attached the transcript of the Florida hearing as purported proof. (2/16/17 Kachroo Decl. ¶ 9 n.1.) She stated, "[d]efendants Baez and Sanchez were specifically asked by the undersigned if they deposited any funds in the [b]ank accounts in question (JP Morgan and Bank of America accounts) and they invoked their [F]ifth . . . Amendment rights." (*Id.*) Remarkably, however, she also stated that "this line of questioning *was omitted* from the transcript" included with Plaintiffs' inquest submissions. (*Id.* (emphasis added).) Even apart from the fact that Defendants apparently invoked the Fifth Amendment with respect to *all* of the questions that they were asked at the Florida hearing – such that it is difficult for this Court to draw the particular adverse inference that they did not deposit fund into certain accounts – it is also troubling that Kachroo would twice make representations to the Court regarding statements made at a hearing, and then file hearing-transcript excerpts that omit those statements.

discussed in the 12/6/16 Order – was "a Swiss bank account that the defendants opened up with investor amounts that were provided to them." (*Id.* at 12.)

In addition to questioning Kachroo and Apak regarding the issues raised in the 12/6/16 Order, this Court also asked Kachroo why she did not simply compute damages by taking the sum of out-of-pocket losses from each investor on the investor list. (*Id.* at 27.) Kachroo responded that some investors wrote checks to Defendants, and the bank records only recorded those checks as "deposits" made by Defendants, without specifying the investors' names. (*Id.* at 28-29.) Thus, according to Kachroo, it was impossible to track those investors' deposits and withdrawals in the subject FIT Corp. accounts. (*Id.*)

This Court also noted that, although Plaintiffs had submitted declarations from named Plaintiffs Rubio and Quintero claiming specific amounts in damages, Plaintiffs had not provided any documents to support those numbers. (*Id.* at 47.) Kachroo responded that she had "all of [Rubio and Quintero's] documents," so she could provide such backup documents. (*Id.*)

At the end of the hearing, this Court asked Plaintiffs to file supplemental submissions to remedy the errors acknowledged on the record at the hearing. (*Id.* at 45-46.) This Court cautioned Kachroo that this would be "the fourth time going back to the well," and urged her to "spot check" Plaintiffs' damages computations herself and ensure that any revised damages computation was "transparent," "logical," and "supported." (*Id.* at 48-49.)

The following day, Kachroo requested in excess of two months to file the discussed supplemental materials. (Dkt. 49 (Letter from Gaytri Kachroo, Esq. to the Court, dated Jan. 12, 2017)). On January 13, 2017, this Court denied the request, and formalized its invitation for supplemental submissions in an Order, stating that, no later than February 16, 2017, Plaintiffs should provide the Court with (a) the investor list referenced by Kachroo and Apak at the

hearing; (b) a sworn affidavit or declaration from Apak explaining, in detail, his methodology in computing Plaintiffs' damages, including all assumptions made regarding which withdrawals were made by Defendant-controlled entities and which line-items in the bank statements constituted administrative fees, taxes, and other expenses excluded from damages; (c) documentation supporting the damages claimed by named Plaintiffs Rubio and Quintero in the declarations that they had previously submitted to the Court; (d) a sworn affidavit or declaration from the third named Plaintiff, Bolivar, setting out his claimed individual damages, together with documentation sufficient to support those damages; and (e) a corrected damages spreadsheet adjusting Plaintiffs' damages computation "so as to account for funds deposited into the investment accounts by Defendant, through any account or entity that Defendants are believed to have controlled, including but not limited to the money market account referenced in this Court's 12/6/16 Order." (Dkt. 51 (Order, dated Jan. 13, 2017 ("1/13/17 Order")), at 3-4.)

### d. Plaintiffs' Fourth Set of Inquest Submissions

On February 17, 2017, the day after the Court-ordered deadline, Plaintiffs filed a fourth set of inquest submissions. (*See* Dkts. 52-54.) These submissions contained another declaration from Class Counsel (Dkt. 52 (2/16/17 Kachroo Decl.); unsolicited excerpts from the transcript of the November 20, 2009 Florida bankruptcy proceeding referenced in the Complaint (Dkt. 52-3); various court documents from those Florida bankruptcy proceedings (Dkt. 52-19 ("Florida Court Documents"))[6]; declarations from Rubio, Quintero, and Bolivar with exhibits[7]; four investor lists

---

[6] Without explanation, Plaintiffs only publicly filed five pages of these Florida court documents, but delivered an additional 13 pages to the Court in hard-copy form.

[7] Without explanation, Plaintiffs only submitted these declarations in hard-copy form. The exhibits to the declarations, however, were filed at Dkts. 52-4, 52-5, and 52-6.

(*see* Dkts. 52-7, 52-8, 52-9)[8]; a supplemental declaration from Apak (Dkt. 54 (Declaration of Adam Apak, dated Feb. 16, 2017 ("2/16/17 Apak Decl.")); revised damages spreadsheets (Dkts. 52-10 ("2/17/17 Damages Spreadsheet #1"), 52-11 ("2/17/17 Damages Spreadsheet #2")); and various spreadsheets purporting to illustrate Plaintiffs' damages computation methodology for the months that this Court discussed in the 12/6/16 Order (Dkt. 52-12 through Dkt. 52-17 (collectively, the "Illustrative Spreadsheets")).[9]

Through these supplemental submissions, Plaintiffs modified their claimed damages again, asserting compensatory damages in the amount of $36,870,941.85. (2/16/17 Kachroo Decl. ¶¶ 6, 20, 40; 2/16/17 Apak Decl. ¶¶ 19, 25.) As discussed further below, rather than simply correcting the errors and that this Court pointed out in the 12/6/16 Order and at the 1/11/17 Hearing, Plaintiffs arrived at this figure through a brand new methodology, resulting in decreased damages in some months, and increased damages in others. Additionally, without any explanation, Plaintiffs increased the period over which they were requesting prejudgment interest by a month, from a start date of June 14, 2003 to May 15, 2003. (2/16/17 Kachroo Decl. ¶¶ 39-40.) Also without any explanation, Plaintiffs presented two separate prejudgment interest calculations – one computed from their compensatory damages ($41,175,245.50) and one computed from their trebled compensatory damages ($234,255,841.95) – without any indication as to which this Court should award or any legal support for choosing one over the other. (*Id.*

---

[8] The fourth list that was not publicly filed, presumably because it contains the home addresses of the investors.

[9] In an apparent oversight, rather than filing a spreadsheet breaking down the January 2006 bank records, Plaintiffs filed two identical spreadsheets for the December 2008 bank records. (*See* Dkts. 52-15, 52-16, 52-17.) Moreover, despite claiming damages for account activity in both a JP Morgan and Bank of America account in 2008 and 2009, Plaintiffs' 2008 and 2009 spreadsheets only break down bank-account activity in the JP Morgan account. (*Compare* Dkts. 52-17, 52-18 *with* Dkts. 52-10, 52-11.)

¶¶ 39-40.)  Thus, accounting for the $455.00 in costs that Plaintiffs are still seeking and the

trebling of compensatory damages under RICO, Plaintiffs current inquest submission seeks

either $151,788,526.05 or $344,859,122.50 in total damages.  (*See id.* ¶ 40.)

## DISCUSSION

### I.  APPLICABLE LEGAL STANDARDS FOR ESTABLISHING DAMAGES UPON DEFAULT

While "default is an admission of all well-pleaded allegations against the defaulting

party," *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004); *see

also Finkel*, 577 F.3d at 84 (noting that, where a defendant has defaulted, the well-pleaded

allegations of the complaint are deemed to be true), a court is still "'required to determine

whether the [plaintiff's] allegations establish [the defendant's] liability as a matter of law,'" *City

of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011) (alteration in original;

quoting *Finkel*, 577 F.3d at 84); *accord Taizhou Zhongneng Import and Export Co. v.

Koutsobinas*, 509 F. App'x 54, 56 (2d Cir. 2013) (summary order).  "If the complaint fails to

state a cognizable claim, a plaintiff may not recover even upon defendant's default." *Allstate

Ins. Co. v. Afanasyev*, No. 12cv2423 (JBW) (CLP), 2016 WL 1156769, at *6 (E.D.N.Y. Feb. 11,

2016) (citing *Finkel*, 577 F.3d at 84), *report and recommendation adopted*, 2016 WL 1189284

(Mar. 22, 2016).

Further, although a "default judgment entered on well-pleaded allegations in a complaint

establishes a defendant's liability," *Bambu Sales, Inc. v. Ozak Trading, Inc.*, 58 F.3d 849, 854

(2d Cir. 1995) (internal quotation marks and citation omitted), it does not reach the issue of

damages, *see Ferri v. Berkowitz*, 561 F. App'x 64, 65 (2d Cir. 2014) (summary order) (citing

*Transatl. Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997)).

A plaintiff must therefore substantiate its claim for damages with admissible evidence to prove

the extent of those damages.  *See Hounddog Prod., L.L.C. v. Empire Film Grp., Inc.*,

826 F. Supp. 2d 619, 627 (S.D.N.Y. 2011) (citing *Greyhound Exhibitgroup, Inc. v. E.L.U.L.*

*Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992)); *Braccia v. D'Blass Corp.*, No. 08cv08927

(LTS) (KNF), 2011 WL 2848146, at *3 (S.D.N.Y. June 13, 2011), *report and recommendation*

*adopted*, 2011 WL 2848202 (July 18, 2011).

   The plaintiff also bears the burden to "introduce sufficient evidence to establish the

amount of damages with reasonable certainty."  *RGI Brands LLC v. Cognac Brisset-Aurige,*

*S.A.R.L.*, No. 12cv01369 (LGS) (AJP), 2013 WL 1668206, at *6 (S.D.N.Y. Apr. 18, 2013),

*report and recommendation adopted*, 2013 WL 4505255 (Aug. 23, 2013).  While a plaintiff is

entitled to all reasonable inferences in its favor based upon the evidence submitted, *see U.S. ex*

*rel. Nat. Dev. & Const. Corp. v. U.S. Envtl. Universal Servs., Inc.*, No. 11cv730 (CS), 2014 WL

4652712, at *3 (S.D.N.Y. Sept. 2, 2014) (adopting report and recommendation), if a plaintiff

fails to demonstrate its damages to a reasonable certainty, then the court should decline to award

any damages, even where liability has been established through default, *see Lenard v. Design*

*Studio*, 889 F. Supp. 2d 518, 538 (S.D.N.Y. 2012) (adopting report and recommendation).

## II.   <u>ADEQUACY OF PLAINTIFFS' PLEADED CLAIMS</u>

   Despite this Court's instruction that "Plaintiffs' Proposed Findings should specifically tie

the proposed damages figure(s) to the legal claim(s) on which liability has now been established"

(Dkt. 40), Plaintiffs' Proposed Findings regarding damages refer only to their claims for

common law fraud and a RICO violation (*see* Proposed Findings, at 6-8[10]).  Thus, although this

Court does not deem Plaintiffs' other claims to have been abandoned on this inquest, *see*

---

[10] In their memorandum summarizing their supplemental submissions, Plaintiffs
incorporated by reference their initially submitted Proposed Findings, dated Nov. 20, 2015, and
did not file amended Proposed Findings.  (*See* Pl. Supp. Mem., at 2.)

*Nwagboli v. Teamwork Transp Corp.*, No. 08cv4562 (JGK) (KNF), 2009 WL 4797777, at *3 n.1 (S.D.N.Y. Dec. 7, 2009) (citation omitted), *report and recommendation adopted in an unreported order* (S.D.N.Y. Mar. 9, 2010), this Court will only assess the adequacy of their fraud and RICO claims in determining an appropriate damages award. These two claims cover the full extent of the damages that Plaintiffs seek, in that, while the underlying damages would be the same, the fraud claim, brought against three of the four defendants, provides for prejudgment interest, *In re Crazy Eddie Sec. Litig.*, 948 F. Supp. 1154, 1166 (E.D.N.Y. 1996), and the RICO claim, brought against all four defendants, provides for treble damages, *Panix Prods., Ltd. v. Lewis*, No. 01cv2709 (HB), 2003 WL 21659370, at *3 (S.D.N.Y. July 15, 2003) (citing 18 U.S.C. § 1964(c)).[11]

### A.     Common Law Fraud

"Under New York law, to state a claim for fraud a plaintiff must demonstrate:  (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false;

---

[11] Assessing Plaintiffs' other claims is unnecessary, as each of Plaintiffs' claims arise from the same fraudulent conduct and allege the same injury – *i.e.*, the loss of funds invested with Defendants during the Class Period (*see* Compl. ¶¶ 5, 65-112), and Plaintiffs are not, in any event, entitled to duplicative damages arising from the same conduct and same injury, *see, e.g.*, *Phelan v. Local 305 of United Ass'n of Journeymen*, 973 F.2d 1050, 1063 (2d Cir. 1992) ("A plaintiff may not recover twice for the same injury." (citations omitted)); *Allstate Ins. Co. v. Williams*, No. 13cv2893 (RJD) (JMA), 2014 WL 6900121, at *10 (E.D.N.Y. Dec. 5, 2014) (adopting report and recommendation); *Int'l Gemmological Inst. v. Rafaeil*, No. 05cv2395 (JGK) (JCF), 2005 WL 3880222, at *4-7 (S.D.N.Y. Aug. 17, 2005), *report and recommendation adopted*, 2006 WL 739822 (Mar. 21, 2006). Moreover, even if Plaintiffs' other claims were sufficiently pleaded, none would entitle Plaintiffs to damages that are distinct from their alleged fraud or RICO damages. *See id.*; *see also* 7 U.S.C. § 25(a)(1) (providing for an award of "actual damages," rather than statutory damages, in private actions brought under the CEA). Additionally, this Court notes that there is no private right of action for control person liability under Section 13(b) of the CEA, which Plaintiffs allege as their sixth cause of action. *See In re Platinum and Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 600 (S.D.N.Y. 2011) (citations omitted); *see also* 7 U.S.C. § 13c(b) (control person liability under the CEA may be alleged in an "action brought by the [Commodity Futures Trading] Commission").

(3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (citing *Lama Holding Co. v. Smith Barney, Inc.*, 646 N.Y.S.2d 76, 80 (1996)).[12]  In addition, pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, a plaintiff who alleges fraud "must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "[I]n order to comply with Rule 9(b), 'the complaint must:  (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  "[W]here the fraudulent conduct is alleged to have taken place over a number of years, the requirements of Rule 9(b) are less stringently applied."  *U.S. ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 326 (S.D.N.Y. 2004) (citation and internal quotation marks omitted).  Moreover, although, under Rule 9(b), "[m]alice, intent, knowledge, and other condition[s] of mind of a person may be averred generally," Fed. R. Civ. P. 9(b), a plaintiff must also "allege facts that give rise to a strong inference of fraudulent intent," *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("The requisite 'strong inference' of fraud may be established either (a) by alleging facts that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." (citations omitted)).

---

[12] Plaintiffs, citizens of Florida, rely on New York law to support their fraud claim, without conducting a choice-of-law analysis.  (*See* Pl. Proposed Findings, at 6.)  Regardless, the Court may apply New York law given that Florida law requires proof of "substantially the same" fraud elements as New York "with slightly different wording and numbering."  *See AHW Inv. P'ship v. Citigroup Inc.*, 980 F. Supp. 2d 510, 519 n.6 (S.D.N.Y. 2013) (citations omitted).

In this action, Plaintiffs only allege fraud as to defendants Sanchez, Baez, and FIT New York (the "Fraud Defendants"). (*See* Compl. ¶¶ 65-69.) Plaintiffs have identified numerous specific statements made by the Fraud Defendants to solicit Class Members to invest and maintain their investments in Defendants' purported enterprise, including that FIT Group was an actual New York corporation and/or limited liability company, with all applicable and required government approvals, licenses, and permits, through which Defendants executed their proprietary trading strategy. (*See* Compl. ¶¶ 27-28, 32-33, 66.) Plaintiffs have also alleged that the Fraud Defendants provided fabricated financial statements to Class Members showing, for example, "profitable monthly returns of approximately 3-4% over several years." (*Id.* ¶¶ 31, 67.) Additionally, Plaintiffs have alleged that the Fraud Defendants provided these fabricated financial statements to Class Members through Defendants' former agent, Uribe, at his brother's residence in Miami, Florida, his dental offices in Colombia, in clients' homes, and through two specific websites: www.forexfit.com and www.fitcolombia.com. (*Id.* ¶¶ 29, 36.) Plaintiffs have further alleged that the Fraud Defendants promised investors that their investments were protected by so-called "stop loss orders," that customer accounts would be segregated, that foreign currency trades would actually be executed, and that an "automated FIT trading system" would distribute profits and losses accordingly to all investors. (*See id.* ¶¶ 29, 31-32, 66.) By these allegations, Plaintiffs' have adequately pleaded that the Fraud Defendants made misrepresentations or omissions of material fact to Class Members, with the specificity required under Rule 9(b) for a scheme alleged to have taken place over a 10-year period.

Plaintiffs have also alleged that each of these statements was false; that "[the Fraud] Defendants had actual knowledge that these statements were false when they made them"; that the they "made such statements intentionally so that the Class Members would rely upon them";

that the Class Members "reasonably, justifiably relied upon" these representations "in deciding to invest and maintain their investments with Defendants"; and that none of the Class Members "had any knowledge of Defendants' fraud, nor could have known" of it. (*See id.* ¶¶ 33-36, 60, 63, 66-68.) Additionally, Plaintiffs have alleged facts giving rise to "a strong inference of fraudulent intent," particularly regarding the suspiciously-timed transactions that allegedly caused Defendants' catastrophic losses in the foreign currency trading market, the use by Sanchez and Baez of a fictitious entity to defraud investors, and Defendants' perpetration of a Ponzi scheme. *See, e.g.*, *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2006) (holding that plaintiffs who alleged that the defendants perpetrated a Ponzi scheme sufficiently alleged fraudulent intent; collecting cases holding that fraudulent intent "is presumed to be established" in Ponzi scheme cases); *Eclaire Advisor Ltd. v. Daewoo Eng'g & Constr. Co.*, 375 F. Supp. 2d 257, 268-69 (S.D.N.Y. 2005) (noting that circumstantial evidence of fraudulent intent includes the "suspicious timing of transactions" and "the use of fictitious parties," among others). Finally, Plaintiffs have alleged that the Fraud Defendants' false statements directly and proximately caused Class Members to suffer damages. (Compl. ¶ 69.)

In sum, through their allegations, which describe Defendants' multi-year Ponzi scheme in detail, Plaintiffs have sufficiently pleaded the elements of New York common-law fraud against the Fraud Defendants, with the particularity required by Rule 9(b). Plaintiffs' allegations also make out a claim for joint and several liability among the Fraud Defendants. *See, e.g. Gov't Emps. Ins. Co. v. IAV Med. Supply, Inc.*, 11cv4261 (ARR) (RER), 2013 WL 764735, at *9 (E.D.N.Y. Feb. 8, 2013) ("In a scheme where there are repeated fraudulent acts by multiple defendants, plaintiffs are entitled to recover once for every fraudulent act, and each defendant who participated in the fraudulent act is jointly and severally liable for the amount of damage

caused." (internal quotation marks and citation omitted)), *report and recommendation adopted*,

2013 WL 765190 (Feb. 28, 2013).

### B.   <u>RICO Violation</u>

Plaintiffs also allege that all of the Defendants have violated, and conspired to violate, the

RICO statute, 18 U.S.C. §§ 1962(c) and 1962(d), through predicate acts of mail and wire fraud.

(Compl. ¶¶ 2, 97-104.)[13]   "'To establish a RICO claim, a plaintiff must show:  (1) a violation of

the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury

was caused by the violation of Section 1962.'"[14]  *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115,

120 (2d Cir. 2013) (quoting *DeFalco v. Bernas*, 224 F.3d 286, 305 (2d Cir. 2001)).  "To establish

a violation of § 1962(c), in turn, a plaintiff must show that a person engaged in '(1) conduct (2)

of an enterprise (3) through a pattern (4) of racketeering activity.'"  *Id.* (quoting *DeFalco*, 244

F.3d at 306).  These four elements "must be pleaded as to every, individual defendant."  *Boritzer

v. Calloway*, No. 10cv6264 (JPO), 2013 WL 311013, at *4 (S.D.N.Y. Jan. 24, 2013) (citing

*DeFalco*, 224 F.3d at 306).  "[T]o state a claim for RICO conspiracy under § 1962(d), a plaintiff

must allege 'some factual basis for a finding of a conscious agreement among the defendants'" to

commit the predicate acts of the RICO violation.  *Picard v. Kohn*, 907 F. Supp. 2d 392, 400

---

[13] Plaintiffs also allege bank fraud as a predicate act (*id.* ¶ 101), but that allegation is insufficient to state a claim given that Plaintiffs are not financial institutions.  *See Edmonds v. Seavey*, No. 08cv5646 (HB), 2009 WL 2949757, at *6 n.8 (S.D.N.Y. 2009).

[14] Under Section 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  18 U.S.C. § 1962(c).  Under Section 1962(d), it is "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  18 U.S.C. § 1962(d).

(S.D.N.Y. 2012) (quoting *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 26 n.4 (2d Cir. 1990)).

### 1. RICO Enterprise

Plaintiffs asserting a RICO claim under Section 1962(c) "must allege and prove the existence of two distinct entities:  (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name," as the statute applies only to "'person[s] who are 'employed by or associated with' the 'enterprise.'"  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001) (citing 18 U.S.C. §§ 1961(3), 1961(4)).  In *Cedric Kushner*, the Supreme Court held that a plaintiff adequately alleged a distinct RICO "person" and "enterprise," when it alleged that a corporation's president and sole shareholder was the RICO "person," and his corporation was the RICO "enterprise."  *Id.* at 163.

Moreover, "[a] RICO plaintiff must also allege that the defendants 'conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'"  *De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 301 (S.D.N.Y. 2013) (quoting 18 U.S.C. § 1962(c); citing *Reves v. Ernst & Young*, 507 U.S. 170, 177-79 (1993)); *see also In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 454 (S.D.N.Y. 1998) ("[T]o be subject to RICO liability, a defendant must have participated, directly or indirectly, in the operation or management of the enterprise." (citing *Reves*, 507 U.S. at 183)).

In this matter, Plaintiffs assert that defendants Sanchez, Baez, FIT Corp., and FIT New York are "persons" under the RICO statute, 18 U.S.C. § 1961(3).  (Compl. ¶ 98.)  Sanchez and Baez are alleged to be the sole shareholders, officers, and directors of FIT Corp. and FIT New York.  (*Id.* ¶¶ 14-15.)  Sanchez and Baez are also alleged to have marketed their purported foreign currency trading scheme directly and through FIT New York, and to have opened bank

accounts to hold the funds obtained from their scheme through FIT Corp. (*See id.* ¶¶ 26-27, 30-37.) Plaintiffs assert that FIT Group, on the other hand, is the RICO "enterprise" under U.S.C. § 1961(4), because it constitutes "a group of individuals, including Defendants and [non-party] corporate co-conspirators FIT Switzerland and FIT Colombia, among other corporate instrumentalities and other persons, associated in fact although not a legal entity." (*Id.* ¶ 98.) Plaintiffs also allege that the association-in-fact of FIT Group, through which Sanchez and Baez purportedly executed their propriety trading strategy, is in fact the Ponzi scheme in this matter, "organized to solicit fraudulently the investment funds of clients . . . and to misappropriate those funds for the personal benefit and use of Defendants and their co-conspirators." (*Id.* ¶¶ 27, 99.) These allegations are sufficient to satisfy the requirement under Section 1962(c) that Plaintiffs allege a distinct RICO person and enterprise. *See 4 K&D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 537 (S.D.N.Y. 2014). These allegations are also sufficient to plead each Defendant's conduct and participation in the operation or management of the alleged RICO enterprise. *See Sumitomo Copper Litig.*, 995 F. Supp. at 454.

## 2. Pattern of Racketeering Activity

Plaintiffs asserting a Section 1962(c) RICO claim must also allege a "pattern of racketeering activity," which entails "at least two acts of racketeering activity" within 10 years of one another. 18 U.S.C. § 1961(5). "Racketeering activity," as defined by RICO, includes a number of criminal offenses, including mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343). *See* 18 U.S.C. § 1961(1). Demonstrating a "pattern of racketeering activity" requires showing that the activity is "'related'" and "'amount[s] to or pose[s] a threat of continued criminal activity.'" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 478 (2d Cir. 2014) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

### a.     <u>Predicate Acts of Mail and Wire Fraud</u>

Plaintiffs adequately state claims for mail and wire fraud under 18 U.S.C. §§ 1341 and 1343. To state claims for mail and wire fraud as predicates for a RICO violation, Plaintiffs must allege: "(1) [a] scheme to defraud, including proof of intent; (2) money or property as [the] object of [the] scheme; [and] (3) use of mails [and] wires to further the scheme." *4 K&D Corp.*, 2 F. Supp. 3d at 539 (citation and internal quotation marks omitted); *accord Crawford*, 758 F.3d at 488. The mailed or wired communications need not be fraudulent themselves to violate these statutes, but they must "be made in furtherance of the fraudulent scheme." *Crawford*, 758 F.3d at 488. "Each separate mailing can constitute an offense under the mail fraud statute, even if there is only one scheme to defraud." *Ctr. Cadillac, Inc. v. Bank Leumi Trust Co. of New York*, 808 F. Supp. 213, 227 (S.D.N.Y. 1992), *aff'd*, 99 F.3d 401 (2d Cir. 1995).

Allegations of mail and wire fraud, as predicate acts for a RICO claim, must be pleaded with particularity under Rule 9(b) of the Federal Rules of Civil Procedure. *See Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 412 (S.D.N.Y. 2013) (citing *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184-85 (2d Cir. 2008)). To be sufficient under Rule 9(b), however, "the complaint need not specify the time, place[,] and content of each mail communication where the nature and mechanics of the underlying scheme is sufficiently detailed." *Ctr. Cadillac*, 80 F. Supp. at 229; *see also Sumitomo Copper Litig.*, 995 F. Supp. at 456 ("In complex civil RICO actions involving multiple defendants . . . , Rule 9(b) does not require that the temporal or geographic particulars of each mailing or wire transmission made in furtherance of the fraudulent scheme be stated with particularity. . . . Rule 9(b) requires only that the plaintiff delineate, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme." (citations omitted)). As the court in

*Sumitomo Copper Litig.* stated, the notice function served by Rule 9(b) would not "be advanced in any material way by insisting that a complaint contain a list of letters or telephone calls." *Sumitomo Copper Litig.*, 995 F. Supp. at 456.

As discussed above, Plaintiffs have described, with sufficient particularity, Defendants' scheme to defraud investors of funds intended for trading in foreign currency. (*See* Discussion, *supra*, at Section II(A).) Plaintiffs have also alleged Defendants' knowing and intentional participation in the scheme. (*See id.*) In terms of Defendants' use of mails and wires to further their scheme, Plaintiffs have alleged that "[d]efendants Sanchez, Baez[,] and FIT New York sent through the mails and international wires false and misleading advertisements to clients to solicit funds, and produced false and misleading statements showing purported profits in Forex trading." (Compl. ¶ 102; *see also id.* ¶ 8 (alleging that Defendants' Ponzi scheme involved "the use of the mails and other interstate facilities to communicate with and disseminate misleading information and statements to clients").) Plaintiffs have also alleged that Defendants provided investors with falsified electronic monthly statements over the Internet, showing consistently profitable foreign currency trades. (*Id.* ¶¶ 36-37.) Additionally, Plaintiffs have alleged that Defendants' pattern of racketeering activity extended "over the course of several years from 2000 continually through 2009," and that there are over 600 Class Members. (*Id.* ¶¶ 17, 100.) Given Plaintiffs' additional allegations that FIT New York is based in New York and Class Members reside in multiple different states and countries, leading to the inference that Defendants' fraud crossed state lines, Plaintiffs' allegations are sufficient to plead multiple acts of mail and wire fraud occurring over a 10-year period. *See 4 K & D Corp.*, 2 F. Supp. 3d at 539; *Sumitomo Copper Litig.*, 995 F. Supp. at 457; *see also Alkhatib*, 2015 WL 3507340, at *13

("The use of advertising on the Internet in furtherance of an alleged fraud satisfies the interstate wire requirement of [18 U.S.C.] § 1343").

Notably, Plaintiffs exclude defendant FIT Corp. from the set of defendants that perpetrated the acts of mail and wire fraud alleged in the Complaint. (*See, e.g.*, Compl. ¶ 102 ("Defendants Sanchez, Baez[,] and FIT New York have engaged in repeated acts of mail and wire fraud").) Rule 9(b) requires that allegations of mail or wire fraud be pleaded with particularity as to each defendant. *See United States Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 444 (S.D.N.Y. 2004). Nonetheless, as discussed below, Plaintiffs have sufficiently pleaded that FIT Corp. is liable under Section 1962(d) for conspiring to violate Section 1962(c) with the other RICO defendants. *Cf. Gov't Emps. Ins. Co. v. Badia*, No. 13cv1720 (CBA) (VMS), 2015 WL 1258218, at *23 (E.D.N.Y. Mar. 18, 2015) (holding that a RICO conspirator is jointly and severally liable for all damages caused by the conspiracy, regardless of personal involvement (collecting cases)).

### b.  Pattern of Predicate Acts

Having found that the Complaint adequately alleges that Defendants committed at least two acts of racketeering activity within 10 years of one another, this Court still must determine whether the Complaint alleges a "pattern of racketeering activity," in that the activity is "'related'" and "'amount[s] to or pose[s] a threat of continued criminal activity.'" *Crawford*, 758 F.3d at 478 (quoting *H.J. Inc.*, 492 U.S. at 239).

Racketeering activity is "related" under RICO where the activity has "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise [is] interrelated by distinguishing characteristics and not isolated events." *H.J. Inc.*, 492 U.S. at 240 (citation and internal quotation marks omitted). In this case, Plaintiffs have adequately alleged that the acts of

mail and wire fraud are "related," in that they served the same purpose of soliciting investor funds under the false pretense that Defendants would use those funds to trade in foreign currency and earn consistent, profitable returns on the Class Members' behalf.

The "continuity" necessary to prove a pattern of racketeering activity may be either "closed-ended" or "open-ended." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999). "Closed-ended continuity" requires a showing that the defendants committed "'a series of related predicates extending over a substantial period of time.'" *Id.* (quoting *H.J., Inc.*, 492 U.S. at 242). The Second Circuit has interpreted "substantial period of time" in this context to mean no less than two years. *Id.* (citations omitted). "Although closed-ended continuity is primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists." *Id.* "Open-ended continuity" requires a showing that "there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Id.* (citing *H.J., Inc.*, 492 U.S. at 242). In assessing whether a plaintiff has shown open-ended continuity, "the nature of the RICO enterprise and of the predicate acts are relevant." *Id.* "Where the enterprise is engaged primarily in racketeering activity, and the predicate acts are inherently unlawful," open-ended continuity exists. *Id.* at 242-43. Mail and wire fraud have been held not to be "inherently unlawful" in the RICO context. *Westchester Cty. Indep. Party v. Astorino*, 137 F. Supp. 3d 586, 611 (S.D.N.Y. 2015) (collecting cases). On the other hand, "where the enterprise primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate

acts themselves implies a threat of continued criminal activity." *Cofacredit, S.A.*, 187 F.3d at 243 (citations omitted).

Plaintiffs have adequately pleaded closed-ended continuity with respect to Sanchez, Baez, and FIT New York's predicate acts of mail and wire fraud, as they have alleged that these defendants perpetrated these acts continuously over a 10-year period against over 600 Class Members. *See, e.g.*, *De Sole*, 974 F. Supp. 2d at 308 (closed-ended continuity adequately alleged where predicate acts took place over at least three years). Plaintiffs have also adequately pleaded open-ended continuity, as they have alleged that the predicate acts of mail and wire fraud were "the regular way" that Defendants operated their purported business. *See, e.g.*, *Allstate Ins. Co. v. Lyons*, 843 F. Supp. 2d 358, 370 (E.D.N.Y. 2012) (noting that a court may find open-ended continuity even if the RICO defendants subsequently terminate their conduct, because "the threat of continuity must be viewed at the time the racketeering activity occurred" (internal quotation marks and citations omitted)); *Niles v. Palmer*, No. 97cv7573, 1999 WL 1419042, at *9 (S.D.N.Y. Oct. 22, 1999) (open-ended continuity adequately alleged where defendants intentionally defrauded 30 investors through similar schemes involving mail and wire fraud, promoting the sham purchase of securities).

Accordingly, Plaintiffs have sufficiently alleged a pattern of racketeering activity.

### 3. <u>Injury and Causation</u>

To state a claim for a violation of the RICO statute, Plaintiffs must also allege an injury to their business or property, caused by a violation of Section 1962(c). *See Cruz*, 720 F.3d at 120. Plaintiffs must "show that a RICO predicate offense 'not only was a "but for" cause of [their] injur[ies], but was the proximate cause as well.'" *De Sole*, 974 F. Supp. 2d at 310 (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)); *see also Oak*

*Beverages, Inc. v. Tomra of Mass., L.L.C.*, 96 F. Supp. 2d 336, 342-43 (S.D.N.Y. 2000) (noting that, in the mail and wire fraud context, a plaintiff must adequately allege reliance on the defendant's misrepresentations to establish proximate cause) (internal quotation marks and citation omitted)). "Upon a defendant's default, proximate causation is irrefutably established when it is properly alleged in the complaint." *Lukaszuk v. Sudeen*, No. 02cv5143 (JG) (MDG), 2007 WL 4699018, at *5 (E.D.N.Y. Nov. 27, 2007) (citing *Greyhound*, 793 F.2d at 159).

Plaintiffs have alleged that the Class Members "reasonably [and] justifiably relied upon" Defendants' fraudulent misrepresentations "in deciding to invest and maintain their investments with Defendants." (*Id.* ¶ 68.) Such misrepresentations were included within the marketing materials and false financial statements sent through the mails and wires, which led Plaintiffs to believe that Defendants ran a legitimate and consistently successful foreign currency trading operation. (*Id.* ¶¶ 8, 36-37, 66-67, 102.) According to the Complaint, these misrepresentations, and thus, Sanchez, Baez, and FIT New York's racketeering activity, directly and proximately caused injury to the business and property of the Class Members, in that the misrepresentations were the reason that Class Members provided Defendants with over $100 million – a significant portion of which Defendants never returned. (*Id.* ¶¶ 3-5, 34, 68-69, 104.) These allegations are sufficient to plead the injury and causation requirements of the RICO statute. *See, e.g.*, *In re Crazy Eddie Sec. Litig.*, 812 F. Supp. 338, 355 (E.D.N.Y. 1993) (finding that a complaint adequately alleged injury and causation under RICO where it alleged that plaintiffs had purchased certain shares in the defendant corporation "in reasonable reliance upon false financial disclosures sent by mail or transmitted by wire").

## 4. **Conspiracy**

In addition to a RICO violation under 18 U.S.C. § 1962(c), Plaintiffs also allege that "Defendants conspired with each other and other co-conspirators to violate 18 U.S.C. § 1962(d)." (Compl. ¶ 103.) As noted, to state a claim for a RICO conspiracy under Section 1962(d), Plaintiffs must allege "'some factual basis for finding a conscious agreement among the defendants'" to commit the predicate acts of the alleged RICO violation. *Picard*, 907 F. Supp. 2d at 400 (quoting *Hecht*, 897 F.2d at 26 n.4). "[I]t is not necessary for the conspiratorial agreement to be express, so long as its existence can plausibly be inferred from words, actions, and the interdependence of activities and persons involved." *Envtl. Servs., Inc. v. Recycle Green Servs., Inc.*, 7 F. Supp. 3d 260, 275 (E.D.N.Y. 2014) (internal quotation marks and citations omitted); *see also Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514, 540 (S.D.N.Y. 2001) ("An individual may be liable [under Section 1962(d)] only if he knew of the conspiracy's goals and agreed to facilitate them." (citation omitted)).

In this case, the Complaint states that defendants Sanchez and Baez were FIT Corp.'s and FIT New York's sole shareholders, officers, and directors. (Compl. ¶¶ 15, 30.) Moreover, the Complaint alleges that FIT Corp.'s purpose was to facilitate Sanchez, Baez, and FIT New York's predicate acts of mail and wire fraud by opening bank accounts to hold the funds that they fraudulently obtained from investors. (*See id.* ¶¶ 30, 33.) Accordingly, an agreement between FIT Corp. and the alleged perpetrators of the mail and wire fraud – Sanchez, Baez, and FIT New York – can be inferred from the Complaint, given the interdependence of these entities and individuals in the alleged scheme to defraud the Class Members, and Sanchez and Baez's sole ownership and control over both FIT New York and FIT Corp. Thus, while the Complaint fails to allege that FIT Corp. violated 18 U.S.C. § 1962(c), it adequately alleges that FIT Corp. is

liable as a conspirator under 18 U.S.C. § 1962(d). FIT Corp. is therefore jointly and severally liable for all damages caused by the other defendants' violation of Section 1962(c). *See Gov't Emps. Ins. Co.*, 2015 WL 1258218, at *23.

Plaintiffs also adequately allege that Sanchez, Baez, and FIT New York are liable under Section 1962(d) for conspiring to violate the RICO statute. As discussed, these defendants each worked together to commit mail and wire fraud in furtherance of their fraudulent foreign currency trading scheme, and Sanchez and Baez owned and controlled FIT New York. Thus an agreement to violate Section 1962(c) can be inferred. *See Palatkevich v. Choupak*, Nos. 12cv1681, 12cv1682 (CM), 2014 WL 1509236, at *21-22 (S.D.N.Y. Jan. 24, 2014).

## III.   THE NAMED PLAINTIFFS' DAMAGES

### A.      Damages Available for Fraud and RICO Violations

Under New York law, fraud damages are limited to "out-of-pocket" expenses, which only include damages for "actual pecuniary loss" directly resulting from the fraud. *Negrete v. Citibank, N.A.*, No. 15cv7250, 2016 WL 3002421, at *9 (S.D.N.Y. May 19, 2016) (internal quotations and citations omitted). Such damages exclude "recovery of profits which would have been realized in the absence of fraud." *Id.*; *see also Lama Holding Co. v. Smith Barney Inc.*, 646 N.Y.S.2d 76, 80 (1996) ("Damages are to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained." (citations omitted)). Fraud damages "must be the direct, immediate, and proximate result" of the defendant's misrepresentations, and "must also be independent of other causes." *Kregos v. Associated Press*, 3 F.3d 656, 665 (2d Cir. 1993) (citations omitted).

RICO damages must be "sufficient to place the plaintiff in the same financial position he would have occupied absent the illegal conduct." *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096,

1106 (2d Cir. 1988) (citing *Illinois C.R. Co. v. Crail*, 281 U.S. 57 (1930); additional citation omitted); *see also Lukaszuk*, 2007 WL 4699018, at *5 (noting that the plaintiffs' fraud and RICO damages would be identical where the plaintiff was a victim of a Ponzi scheme). Plaintiffs alleging a RICO claim "may not recover for speculative losses or where the amount of damages is unprovable." *Makowski v. United Bhd. Of Carpenters and Joiners of Am.*, No. 08cv6150 (PAC), 2010 WL 3026510, at *8 (S.D.N.Y. Aug. 2, 2010) (citations and internal quotation marks omitted). Moreover, plaintiffs alleging a RICO claim "are only entitled to damages proximately caused by the predicate acts" of the RICO violation. *Crazy Eddie*, 948 F. Supp. at 1165 (citing *Am. Nat'l Bank and Trust Co. v. Haroco, Inc.*, 473 U.S. 606, 609 (1985)). Treble damages under RICO are mandatory. *MDO Dev. Corp. v. Kelly*, 735 F. Supp. 591, 593 (S.D.N.Y. 1990); *see also* 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and *shall recover* threefold the damages he sustains . . . ." (emphasis added)).

Prejudgment interest on fraud and RICO claims differ. "Under New York law, awarding prejudgment interest on damages awarded for fraud is mandatory." *Crazy Eddie*, 948 F. Supp. at 1166 (citations omitted); *see also* N.Y.C.P.L.R. § 5001. On the other hand, "[t]he RICO statute is silent on the subject of prejudgment interest," and, while courts have discretion to issue such an award, courts generally do not award prejudgment interest on a RICO claim where treble damages are adequate to compensate the plaintiffs. *Bingham v. Zolt*, 810 F. Supp. 100, 101-02 (S.D.N.Y. 1993) (noting that the purpose of both treble damages and prejudgment interest under RICO is to fully compensate the plaintiffs, and "treble damages will usually more than adequately compensate a plaintiff for actual damages suffered"); *see also Crazy Eddie*, 948 F.

Supp. at 1167 (denying award of prejudgment interest on nine-figure RICO claim where treble damages were adequate to compensate the class).

Under a fraud claim, the statutory rate for prejudgment interest under New York law is nine percent per annum. *See* N.Y.C.P.L.R. § 5004. Prejudgment interest is typically computed "from the earliest ascertainable date the cause of action existed," but, "[w]here damages were incurred at various times," may be computed from each date the damages were incurred or "from a single reasonable intermediate date." N.Y.C.P.L.R. § 5001(b). Where prejudgment interest is to be awarded to a large class, and "determination of precise dates for accrual of prejudgment interest is almost impossible," courts have "wide discretion in determining a reasonable date from which to award prejudgment interest, and the date the action was commenced has generally been found to be appropriate." *Crazy Eddie*, 948 F. Supp. at 1167-68 (collecting cases); *see also Conway v. Icahn & Co.*, 16 F.3d 504, 512 (2d Cir. 1994) ("[W]here damages are incurred at various times after the cause of action accrues, section 5001 grants courts wide discretion in determining a reasonable date from which to award prejudgment interest").

**B.      Plaintiffs' Individual Investment Losses**

The named Plaintiffs in this action – Class Representatives Bolivar, Quintero, and Rubio – have submitted declarations and financial statements to support their individual assertions of damages, distinguishing their damages claims from those of the remainder of the Class. Inexplicably, only the exhibits to the declarations were publicly filed. (*See* Dkts. 52-4, 52-5, 52-6.) The declarations themselves, despite being materially identical to declarations that Plaintiffs have previously filed, were delivered to the Court only in hard-copy form. In any event, this Court addresses, in turn, the claimed damages of each of the named Plaintiffs.

1. **Manuel Bolivar**

In Bolivar's Declaration, dated February 15, 2017, he states under penalty of perjury that he transferred $182,000 to FIT Corp. in 2008 for the purpose of "investing in foreign currency" with Defendants.  (Declaration of Manuel Bolivar, dated Feb. 15, 2017 ("2/15/17 Bolivar Decl.") ¶ 2.)  Consistent with the Complaint, he also states that he made this investment in reliance on certain documents provided by Defendants and representations made by Defendants, which had indicated to him that Defendants were running a legitimate and profitable foreign currency trading firm.  (*Id.* ¶¶ 3-9.)  Bolivar further states that, in making his investments with Defendants, he "wired money directly to a bank account held in New York in the name of FIT [International Group] Corp. at JPMorgan Chase Bank and subsequently Bank of America."  (*Id.* ¶ 10; *see also id.* ¶ 2.)  Finally, he states that he lost his entire $182,000 investment with Defendants and has "provided bank statement evidence" of this loss as an exhibit to his Declaration.  (*Id.* ¶ 11.)

The "bank statement evidence" was filed in redacted form at Dkt. 52-6 ("Redacted Bolivar Exhibit"), and was also delivered in hard-copy form to the Court, also redacted.  Upon inspection, this evidence is a five-page excerpt from the FIT Corp. bank records that were previously delivered to the Court in un-redacted form.  (*Compare id. with* Pl. Supp. Mem., Ex. 11 (submitted in hard-copy form only).)  The redacted version of the records show:  (1) a September 12, 2006 deposit of $20,000 from a completely redacted name; (2) a September 29, 2006 deposit of $20,000 by "Manuel Bolivar"; (3) a September 27, 2006 deposit of $36,000 by "Manuel Bolivar"; (4) an April 2, 2008 deposit of $6,000 by an individual with the last name "Bolivar," but his first name redacted; and (5) an August 6, 2008 deposit of $100,000.00 by an individual with the last name "Bolivar," but his first name redacted.  (Redacted Bolivar Exhibit,

at 1-5.)  The un-redacted version of these records, on the other hand, show that the first, fourth, and fifth deposits were made by an individual named "*Mario* Bolivar."  (Pl. Supp. Mem., Ex. 11 (emphasis added).)  Moreover, the fact that these deposits were made by "Mario Bolivar," not "Manuel Bolivar," is clear from the redacted version of these records delivered to the Court, due to the fact that the redactions were made sloppily in black marker, and are largely transparent.

Needless to say, these submissions are highly problematic.  First of all, without any explanation as to whether Mario Bolivar and Manuel Bolivar are the same person, this Court must construe the selective redactions concealing Mario Bolivar's full name in the financial statements as, at best, extremely careless and unprofessional work, and, at worst, an affirmative attempt to mislead the Court.  Second of all, Manuel Bolivar's Declaration states that he invested $182,000 with Defendants in 2008, whereas this evidence shows that Manuel Bolivar deposited $56,000 with FIT Corp. in 2006, and Mario Bolivar deposited $126,000 with FIT Corp. in 2006 and 2008.  In other words, the financial statements provided do not support the statements made in the declaration.

The financial statements do, however, support the notion that Manuel Bolivar invested $56,000 with Defendants.  Moreover, he has provided sworn testimony that he "lost the total investment value of [his] account" with Defendants.  (2/15/17 Bolivar Decl. ¶ 11.)  Drawing all reasonable inferences in Plaintiffs' favor, this Court recommends that Manuel Bolivar be awarded $56,000 in damages, representing his out-of-pocket losses.

### 2. Janneth Quintero

Quintero's Declaration is largely identical to Bolivar's Declaration, except that she states that she invested $107,976.87 with Defendants in 2008 and lost her entire investment. (Declaration of Janneth Quintero, dated Feb. 15, 2017 ("2/15/17 Quintero Decl.") ¶¶ 2, 11.)  In

support of her damages claim, she purports to attach "bank statements" to her Declaration as evidence. (*Id.* ¶ 11.) She has, in fact, attached a two-page document bearing the header, "FIT Monthly Statement," dated "February 1 – February 28, 2009" (Dkt. 52-5 ("Quintero Exhibit")), which appears to be one of the fraudulent electronic statements described in the Complaint as having been provided to investors by Defendants to perpetuate Defendants' Ponzi scheme (Compl. ¶ 36).

The monthly statement shows an "Opening Balance" of $113,106.87, a "Net Profit" of $910.00, a withdrawal, dated February 17, 2009, of $6,040.00, and an "Ending Balance" of $107,976.87. (Quintero Exhibit, at 1-2.) Although the statement does not support Quintero's testimony that she transferred precisely $107,976.87 to Defendants in 2008 and never had any of it returned to her (2/15/17 Quintero Decl. ¶¶ 2, 11), the statement does appear to support the notion that, as of February 28, 2009, Defendants had retained $107,976.87 of Quintero's money. Moreover, the February 2009 FIT Corp. JP Morgan bank records show a $6,000.00 withdrawal sent to Quintero on February 17, 2009 (Pl. Supp. Mem., Ex. 16 (submitted in hard-copy form only)), partially corroborating the contents of the statement. Accordingly, given Quintero's sworn testimony that none of the $107,976.87 balance shown on this document was returned to her, and drawing all reasonable inferences in Plaintiffs' favor, this Court recommends that Quintero be awarded $107,976.87 in damages, representing her out-of-pocket losses.

### 3. Andres Rubio

Rubio's Declaration is largely identical to Quintero's Declaration, except that he states that he deposited $103,947.50 with Defendants in 2008 and lost his entire investment. (Declaration of Andres Rubio, dated February 15, 2017 ("2/15/17 Rubio Decl.") ¶¶ 2, 11.) In support of his damages claim, he attaches two "FIT Monthly Statements": one dated "January 1

– January 31, 2009" and the other dated "February 1 – February 28, 2009."  (Dkt. 52-4 ("Rubio

Exhibit").)  The January statement shows an "Opening Balance" of $63,677.50, a "Net Profit" of

$270.00, a deposit, dated January 26, 2009, of $40,000.00, and an "Ending Balance" of

$103,397.50.  (*Id.* at 2.)  The February statement shows an "Opening Balance" of $103,947.50, a

loss of $3,040.00, and an "Ending Balance" of $100,907.50.  (*Id.* at 1.)

　　　These statements do not support Rubio's testimony that he transferred precisely

$103,947.50 to Defendants in 2008 and never had any of it returned to him.  (2/15/17 Rubio

Decl. ¶¶ 2, 11.)  Indeed, they show that he made a $40,000 deposit with Defendants on

January 26, 2009, and that $270.00 of his balance with Defendants derived from Defendants'

allegedly non-existent foreign currency trading operation.  (Rubio Exhibit, at 2; Compl. ¶ 35

("Defendants never invested the money in Forex trading as they had promised, but merely

siphoned it away to secret private accounts").)  Regardless, the statements do support the notion

that, as of February 28, 2009, Defendants had retained $103,677.50 of Rubio's money,

representing $103,947.50 minus the artificial $270.00 gain, and ignoring the $3,040.00 artificial

loss.  Moreover, the January 2009 FIT Corp. Bank of America bank records show that a $40,000

deposit was made with FIT on January 26, 2009.  (Pl. Supp. Mem., Ex. 15 (submitted in hard-

copy form only).)  Although no name is listed in the description of the deposit, the fact that the

date and amount of the deposit in the bank records is identical to that in the monthly statements

at least partially corroborates the contents of the monthly statements.  Accordingly, given

Rubio's sworn testimony that he "lost the total investment value of [his] account" with

Defendants (2/15/17 Rubio Decl. ¶ 11), and drawing all reasonable inferences in Plaintiffs'

favor, this Court recommends that he be awarded $103,677.50 in damages, representing his out-

of-pocket losses.

### C.    Treble Damages and Prejudgment Interest

As noted, treble damages are mandatory under RICO, so this Court recommends that Bolivar, Quintero, and Rubio be awarded $168,000 ($56,000 x 3), $323,930.61 ($107,976.87 x 3), and $311,032.50 ($103,677.50 x 3), respectively. *See* 18 U.S.C. § 1964(c). Moreover, as prejudgment interest is mandatory under their fraud claim, this Court recommends that Bolivar, Quintero, and Rubio be awarded prejudgment interest under their fraud claim at the statutory rate of nine percent per annum. *See* N.Y.C.P.L.R. §§ 5001, 5004.

Although Plaintiffs' latest inquest submission sets out a computation of prejudgment interest on the trebled amount of damages (2/16/17 Kachroo Decl. ¶¶ 39-40), they have provided no authority to support such a computation. As the trebling and prejudgment interest awards arise from different claims, as the statute providing for prejudgment interest states that such interest is be computed from damages "incurred," N.Y.C.P.L.R. § 5001(b), and as an award of prejudgment interest on treble damages would provide a substantial windfall to Plaintiffs, this Court recommends that prejudgment interest be computed only on damages representing Plaintiffs' out-of-pocket losses. *See Crazy Eddie*, 948 F. Supp. at 1172 (awarding both treble damages and prejudgment interest on RICO and fraud claims, but computing prejudgment interest on the fraud claim only with respect to out-of-pocket losses).

This Court notes that, in all four of their inquest submissions, Plaintiffs have only sought prejudgment interest through October 8, 2015, the date that Judge Gardephe issued the Order of Default. (*See, e.g.*, 2/16/17 Kachroo Decl. ¶ 40.)[15] For this reason, this Court recommends that

---

[15] Plaintiffs also seek an award of post-judgment interest, possibly because a significant period of time has passed since the date in 2015 when the Court entered its Order of Default. Post-judgment interest is mandatory under 28 U.S.C. § 1961, *see Schipani v. McLeod*, 541 F.3d 158, 165 (2d Cir. 2008), but, by definition, it is not subject to calculation as of the date of a judgment. If, in this case, the Court were to proceed to enter final judgment that incorporates

Bolivar be awarded prejudgment interest on a principal of $56,000, from the intermediate date of his two deposits into Defendants' Ponzi scheme, September 28, 2006, through October 8, 2015. *See* N.Y.C.P.L.R. § 5001(b). As Quintero and Rubio have only indicated that they deposited money into Defendants' Ponzi scheme "in 2008" (2/15/17 Quintero Decl. ¶ 2; 2/5/17 Rubio Decl. ¶ 2), without any greater specificity, this Court, in its discretion, recommends that their prejudgment interest be computed on principals of $107,976.87 and $103,677.50, respectively, from July 1, 2008 to October 8, 2015. Based on these dates and applying the nine percent per-annum interest rate, Bolivar, Quintero, and Rubio would be entitled to $45,539.51, $70,980.74, and $68,154.46, respectively, in prejudgment interest.[16]

### D.　Total Damages for Named Plaintiffs

Accordingly, this Court recommends that, in total, Bolivar, Quintero, and Rubio be awarded $213,539.51, $394,911.35, and $379,186.96 respectively, representing the sum of triple their out-of-pocket losses and prejudgment interest computed from the dates listed above, and as summarized below:

---

any damages awards, then I would recommend that the Clerk of Court be directed to include, in that final judgment, additional *prejudgment* interest, calculated at the rate of nine percent per annum, for the period from October 9, 2015 to the date of entry of final judgment, for each of the named Plaintiffs, on the principal amounts of their out-of-pocket losses.

[16] Prejudgment interest is computed as the "per diem interest rate" (principal x 0.09 / 365) multiplied by the number of days in the prejudgment interest period. *See Eurosteel Corp. v. M/V/ KOGGEGERACHT*, No. 01cv7731 (DLC) (FM), 2003 WL 470575, at *4 (S.D.N.Y. Jan. 20, 2003), *report and recommendation adopted*, 2003 WL 1872652 (S.D.N.Y. Apr. 11, 2003); *see also Gov't Emps. Ins. Co. v. Alrof, Inc.*, No. 11cv4028 (SLT) (RER), 2013 WL 9600668, at *12 & n.11 (E.D.N.Y. July 19, 2013).

| Plaintiff | Out-of-Pocket Losses | Treble Damages | Prejudgment Interest Period | Prejudgment Interest on Out-of-Pocket Losses | Total Damages |
|---|---|---|---|---|---|
| Bolivar | $56,000.00 | $168,000.00 | 9/28/06 – 10/8/15 (3,298 days) | $45,539.51 | $213,539.51 |
| Quintero | $107,976.87 | $323,930.61 | 7/1/08 – 10/8/15 (2,666 days) | $70,980.74 | $394,911.35 |
| Rubio | $103,677.50 | $311,032.50 | 7/1/08 – 10/8/15 (2,666 days) | $68,154.46 | $379,186.96 |

As the RICO claim was brought and properly asserted against all four defendants (*see* Discussion, *supra*, at Section II(B)), this Court recommends that all four defendants be held jointly and severally liable for each named plaintiff's treble damages. On the other hand, as the fraud claim was only brought against only defendants Sanchez, Baez, and FIT New York (Compl. ¶¶ 65-69), this Court recommends that only those three defendants be held jointly and severally liable for each named plaintiff's prejudgment interest award.

### E.    Costs

Plaintiffs additionally seek $455.00 in costs, comprised of a $350.00 filing fee and $95.00 in service-of-process fees. (2/16/17 Kachroo Decl. ¶ 40; Pl. Proposed Findings, at 9.) As the RICO statute provides for recovery of "the cost of the suit," these costs are compensable. 18 U.S.C. § 1964(c); *see also Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1167 (2d Cir. 1993).[17] As far as this Court can tell, however, Plaintiffs have not submitted any documentation to substantiate the amount of their service-of-process fees. Accordingly, this Court only recommends that Plaintiffs be awarded their $350.00 filing fee, which is evident from the Docket of this case.

---

[17] Although the RICO statute also provides for attorneys' fees, 18 U.S.C. § 1964(c), Plaintiffs have expressly waived any award of attorneys' fees in this action (*see* Pl. Supp. Mem., at 7).

## IV.    **CLASS DAMAGES**

On behalf of the Class, Plaintiffs currently seek $36,870,941.85 in compensatory damages, treble damages under RICO, and prejudgment interest.  (2/16/17 Kachroo Decl. ¶ 40.) As discussed, Plaintiffs' current inquest submissions before the Court are their *fourth* attempt to establish their claimed damages to the Class to a reasonable certainty, and, in those four attempts, Plaintiffs' requested Class damages have ranged from a high of $58,706,074.22 to a low of $36,870,941.85 – a difference of nearly $22 million.

This Court notes that Plaintiffs have apparently been working on their damages submissions since at least February 2011 (*see* 2/8/11 Kachroo Ltr), and have had ample time and opportunity to prepare logical, transparent, and supported inquest submissions.  So as to avoid the harsh result of recommending that no damages be awarded to the Class, this Court has even provided Plaintiffs with detailed guidance highlighting the flaws that this Court had identified in each of their inquest submissions – issuing multiple written Orders, and asking questions and offering comments at an evidentiary hearing.  Despite all of the time, all of the chances, and all of the instructions provided by this Court, Plaintiffs' current inquest submissions are still woefully deficient, and fail, again, to establish to a reasonable certainty the claimed damages incurred by the Class.

As discussed further below, there are several glaring deficiencies in Plaintiffs' latest damages-computation methodology, which make it impossible for this Court to accept, or even to know how to modify, any of Plaintiffs' proffered figures of Class-wide damages.  In light of this, and given the number of opportunities that this Court has afforded Plaintiffs' counsel to make a reasonably supported damages presentation on behalf of the Class, it has become painfully evident that the Kachroo Firm has not been adequately serving the interests of the

Class.  For this reason – and as, at this point, this Court simply has no principled basis on which it may rest *any* damages computation for all Class members – I recommend that the Court, *sua sponte*, decertify the Class under Rule 23 of the Federal Rules of Civil Procedure, and award damages only to the named Plaintiffs.

### A.    Plaintiffs' New Damages-Computation Methodology

In Plaintiffs' current inquest submissions, they base their damages computation, as they did before, on the account activity reflected in the bank records of defendant FIT Corp., the entity through which Class members allegedly invested in Defendants' Ponzi scheme.  (2/16/17 Kachroo Decl. ¶¶ 20-35; 2/16/17 Apak Decl. ¶¶ 4-5, 8, 10-20.)  According to Plaintiffs' submissions, Apak's firm, AP Consulting, examined every withdrawal made from the subject FIT Corp. accounts, and placed each withdrawal into one of four categories:  (1) "withdrawals sent to [i]nvestors" listed on any of three investor lists ($71,574,554.69 in total); (2) "withdrawals by Defendants to accounts under their control" ($36,870,941.85 in total); (3) "circulated funds between bank accounts" ($30,951,527.58 in total); and (4) "company expenses" ($1,285,306.27 in total).  (2/16/17 Kachroo Decl. ¶¶ 24-35; 2/16/17 Apak Decl. ¶¶ 10-20.)  All withdrawals in the second category, *i.e.*, those sent to Defendant-controlled accounts, were counted towards Plaintiffs' damages.  (2/16/17 Kachroo Decl. ¶¶ 34, 36-37; 2/16/17 Apak Decl. ¶¶ 19, 21-22.)

According to Class Counsel,

> All withdrawals made by individuals and companies not on the three lists defined as 'Investors' (Exhibits 7, 8, 9) were attributed to Defendants and constituted 'Fraud Losses.'  Furthermore, any funds deposited and withdrawn by the same source constituted circulated funds and were subtracted from total losses ('Circulated Funds').  Similarly, expenditures made for day to day operations of the company for third party services such as rent, payroll fees,

> taxes, and consulting and accounting fees, were deducted and not
> included in the calculation of Fraud Losses ('Company Expenses').

(2/16/17 Kachroo Decl. ¶ 19.)  In other words, rather than providing a factual basis for their

assertions that accounts receiving withdrawals in the second category were actually controlled by

Defendants, Plaintiffs have defined this second category of withdrawals as all withdrawals not

falling within their first, third, and fourth categories.  (*Id.*)

Notably, this methodology is a departure from Plaintiffs' prior methodology of assuming

that all withdrawals sent to natural persons besides Sanchez and Baez were sent to investors, and

withdrawals sent to corporate entities were sent to Defendant-controlled accounts.  (*See* 12/6/16

Order, at 12-14.)  This methodology is also a departure from the general methodology in fraud

cases of computing damages from "out-of-pocket" losses.  *See Negrete*, 187 F. Supp. 3d at 467.

In a case such as this one, out-of-pocket losses would equal the difference between the amount

that the Class invested and the amount that Defendants returned to the Class.  *See Lukaszuk*,

2007 WL 4699018, at *6 (where an investor in a Ponzi scheme lost his entire principal

investment, his damages equaled his principal investment).  Here, Plaintiffs have not even

attempted to establish with reasonable certainty the amount that the Class actually invested in

Defendants' alleged Ponzi scheme, despite misleadingly referencing "investor deposits"

throughout their submissions.  (*See, e.g.*, 2/16/17 Kachroo Decl. ¶¶ 24-33; 2/16/17 Apak Decl.

¶¶ 10-16.)  Instead, they have lumped all deposits into the FIT Corp. accounts together, including

those made by Defendants, into one number, and do not even use that number in computing

damages.  (*Compare, e.g.*, Dkt. 52-14 ("May 2005 Spreadsheet") (computing a single sum of

"deposits," which included $3 million in deposits from Defendants' money-market account and

$2,499,979.49 in deposits by an account in the name of "UBS Ag," which Kachroo represented

at the 1/11/17 Hearing belonged to Defendants (Tr. at 12)) *with* 2/17/17 Damages Spreadsheet #1

(counting only withdrawals sent to "non-investors" towards "fraud losses," *i.e.*, damages[18]); *see also* 2/16/17 Kachroo Decl. ¶ 35 ("Any [FIT Corp. account] credit was recorded as a[n] [investor] deposit."); 2/16/17 Apak Decl. ¶ 20 (same).)

In order to gauge the soundness of Plaintiffs' chosen methodology, this Court has closely examined how Plaintiffs have defined their first, third, and fourth categories of withdrawals, and the effect of these definitions on which withdrawals Plaintiffs would now like the Court to presume, by process of elimination, were sent to Defendant-controlled accounts.

### 1. <u>Withdrawals Sent Back to Investors</u>

Plaintiffs determined whether a withdrawal fell within their first category of "withdrawals sent to [i]nvestors" by cross-referencing the names of recipients of each withdrawal with the names appearing on three separate "investor lists," which collectively contained "over 800" unique names of individuals and companies. (2/16/17 Kachroo Decl. ¶¶ 18-20; 2/16/17 Apak Decl. ¶ 6.) If the recipient of a withdrawal was not on one of these lists, then Plaintiffs "attributed [the withdrawal] to Defendants," before subtracting out "circulated funds" and "company expenses." (2/16/17 Kachroo Decl. ¶ 19.) As discussed below, there are problems with all three of these lists, and Plaintiffs' reliance on these lists has introduced new uncertainties into their methodology, and new areas in which their damages claim is likely inflated.

---

[18] Indeed, an examination of Plaintiffs' damages spreadsheets and Kachroo and Apak's Declarations reveals that what Kachroo and Apak meant when they said, "[a]ny credit [in a FIT Corp. account] was recorded as a deposit," is that any credit in those accounts was recorded as an "investor deposit." (2/16/17 Kachroo Decl. ¶ 35; 2/16/17 Apak Decl. ¶ 20.) The "investor deposits" referenced in Kachroo and Apak's Declarations correspond exactly to the "credits" listed on Plaintiffs' damages spreadsheets. (*Compare* 2/16/17 Kachroo Decl. ¶¶ 24-33 *and* 2/16/17 Apak Decl. ¶¶ 10-16 *with* 2/17/17 Damages Spreadsheets #1 and #2.)

The first investor list is "the list of [FIT Corp.'s] creditors from the Florida Assignment for the Benefit of Creditors." (2/16/17 Kachroo Decl. ¶ 18.) This is presumably the "investor list" referenced by Kachroo and Apak at the 1/11/17 Hearing. (*See* Tr. at 7-8; 2/16/17 Kachroo Decl. ¶ 18.) Plaintiffs have now provided two versions of this list – one that Class Counsel has apparently generated herself, filed at Dkt. 52-7 (entitled "Bankruptcy List"), and one that was only submitted to this Court in hard-copy form. The hard-copy version appears in Plaintiffs' submissions as an attachment to a certified copy of a court filing in *In re FIT International Group Corp., Debtor*, No. 09-70096 CA 9 (Fla. Cir. Ct. Sept. 23, 2009), captioned "Petition for an Assignment for Benefit of Creditors." (*See* Fla. Court Docs, at 5-18 (pp. 6-18 not publicly filed).) Although the list is identified in the court filing as a list of FIT Corp.'s secured and unsecured creditors (*id.* at 5), there is no indication that the list includes all investors into Defendants' alleged 10-year Ponzi scheme. Indeed, although defendant Sanchez apparently signed a page in the same court filing "verif[ying] each of the facts set forth in the [list]," there is no explanation as to how the list was generated. (*Id.* at 8 (not publicly-filed).) Upon inspection, the electronically filed version of this list, which includes 498 investors, appears to be identical to the hard-copy version with the following exceptions: the electronically filed version excludes FIT Corp.'s one secured creditor, Bank United; excludes the addresses of each investor; and erroneously lists "Apellido, Nombre" as the first investor. "Apellido, Nombre" is Spanish for "Surname, Name."[19]

The second investor list is a "supplementary list of investors" created by the Kachroo Firm, including "individual clients who approached [the Kachroo Firm] for representation

---

[19] *See* https://www.collinsdictionary.com/dictionary/spanish-english/apellido; https://www.collinsdictionary.com/dictionary/spanish-english/nombre (last accessed Mar. 9, 2017).

against the Defendants." (2/16/17 Kachroo Decl. ¶ 18.) This list includes 205 investors.

(Dkt. 52-8 ("KLS Investors List").) Remarkably, this list states that "Cds Creditos De Seguros

S.A." and "Cgc Ltda. Inc." are Kachroo's clients (*id.* at 4) – two entities that Plaintiffs claimed in

a prior inquest submission were Defendants' sham corporations (*see* 12/6/16 Order, at 13-14).

That issue aside, given the fact that there are only 205 investors on the list and that Plaintiffs

have alleged that there are over 600 Class members (Compl. ¶ 17), Plaintiffs have impliedly

conceded that this list is incomplete by a measure of nearly two-thirds.

The third and final investor list was compiled by Apaks' firm, AP Consulting, "based on

all depositors into FIT Corp. as gleaned from the bank statements." (2/16/17 Kachroo Decl.

¶ 18.) According to Kachroo, "most of these depositors are also found in the first two lists."

(*Id.*) This list includes 782 depositors into FIT Corp.'s JP Morgan accounts and 140 depositors

into FIT Corp.'s Bank of America accounts. (Dkt. 52-9 ("Bank Statement Depositors List").)

Upon inspection, it is clear that this list was mechanically generated to include all entries in the

"Deposits and Credits" columns in the FIT Corp. bank records, and is not limited to individuals

or entities that could reasonably be considered actual Ponzi scheme "investors" or members of

the Class. For example, the list includes names such as "Deposit," and multiple variations of

each of the four Defendants' names. (*Id.* (listing as "investors," *e.g.*, "Fit International Group

Corp," "Fit Forex Invest. Team/Ubs Ag," "Forex International Team," "Dilia M Baez Angarita,"

"Dilia Margarita Baez," "Jairo Enrique Sanchez Dia," "Jairo Sanchez – Ubs Ag," "Sanchez

Diaz, Jairo Enriq").)

Moreover, the list is likely incomplete by necessity, due to the fact that the FIT Corp.

bank records only range from May 2003 to September 2009, and that Defendants' Ponzi scheme

allegedly began on January 1, 2000. (Compl. ¶¶ 1, 16 (alleging a class period of January 1, 2009

to August 25, 2009).) Accordingly, this list would, by definition, exclude all investors who deposited money into the FIT Corp. accounts between January 2000 and May 2003, but not afterwards. Additionally, Kachroo testified that "400 or 350" individuals invested with FIT Corp. by check, and those investors names do not appear in the FIT Corp. bank records at all. (Tr. at 27-28.) For that reason, those investors would not be captured on this list either.

One practical effect of Plaintiffs' reliance on these three lists is that Plaintiffs are now – for the first time – counting withdrawals sent to numerous natural persons, outside of Sanchez and Baez, towards their damages, and are thereby asking this Court to presume that Defendants controlled bank accounts under these natural persons' names. For example, just by examining Plaintiffs' Illustrative Spreadsheets, which summarize Plaintiffs' analysis of six months of FIT Corp. bank records, this Court has learned that Plaintiffs are now counting towards their damages withdrawals sent to:

>Nohora Acero,
>Oskar Albuja,
>Margarita Ramirez Alvarez,
>Alvaro Archila,
>Juan Manuel Giraldo,
>Johnny Gonzalez,
>Cecilia Gutierrez,
>Elsy Latorre,
>Alvaro Pachon,
>Rojas Poliza,
>Clamencia Rengifo,
>Jaime Rueda,
>Laura Rossana Smith, and
>RJ Veneidos.

(*See* Illustrative Spreadsheets.)

Nowhere in the Complaint or in any of Plaintiffs' submissions have Plaintiffs alleged that any of these individuals were Defendants' co-conspirators, that Defendants controlled bank accounts under these names, or that Defendants perpetrated their fraud by opening bank accounts

under pseudonyms. In fact, Plaintiffs had previously excluded payments to these individuals from their damages claim, counting only withdrawals sent to corporate entities and Sanchez and Baez as "theft of investment funds." (*See* 12/6/16 Order, at 12-14.) Such a decision to exclude these individuals from damages in a prior inquest submission would appear to imply that Plaintiffs previously believed that these individuals were Class members.

As has been the pattern in Plaintiffs' inquest submissions, Plaintiffs have provided no factual basis whatsoever for this Court to have any confidence in their assertion that withdrawals sent to these individuals were fraudulent. In fact, many of these individuals' names share surnames with those who appear on Plaintiffs' three investor lists, which include names such as:

> Rafael Acero,
> Maria Isabel Archila,
> Carlos Alberto Giraldo,
> Rodolfo and Hernan Gutierrez,
> Francisco and Luis Gonzalez,
> Emilio Latorre,
> Fernando and Monica Pachon,
> Hugo and Gustavo Rengifo, and
> Roberta Rueda.

(*See* Bankruptcy List; KLS Investors List; Bank Statement Depositors List.) For Plaintiffs to assert that withdrawals sent to the latter set of individuals were sent back to the Class, but that withdrawals sent to the former set of individuals were fraudulent and should be paid back to the Class in damages, without any explanation, is untenable.

Moreover, the dollar impact of this approach on Plaintiffs' computation of damages is far from trivial, and has resulted in an increase in the amount of claimed damages in numerous months in Plaintiffs' damages period. Indeed, overall, Plaintiffs are now claiming that Defendants returned nearly $7 million *less* in withdrawals to investors than Plaintiffs had previously claimed were returned. (*Compare* Pl. Hr'g Ex. 2, at 2 (stating that $78,533,515.51 of

FIT Corp. withdrawals were returned to investors) *with* 2/16/17 Kachroo Decl. ¶ 34 (stating that $71,574,554.69 of FIT Corp. withdrawals were returned to investors).)  As just one example of how Plaintiffs achieved this increase in their damages, Plaintiffs previously sought $3,133,855.76 in damages for the month of November 2007 (10/12/16 Damages Spreadsheet, at 1; *see also* Pl. Hr'g Ex. 1, at 1 (seeking $3,270,770.32 in damages)), but now seek $3,387,825.68 (2/17/17 Damages Spreadsheet #1, at 2; Dkt. 52-15 ("November 2007 Spreadsheet"), at 5).  This increase in alleged damages derives in part from the fact that Plaintiffs are now counting withdrawals sent to Oskar Albuja, Alvaro Archila, Rojas Poliza, and Jamie Rueda towards their damages, whereas in prior inquest submissions, they did not do so.  (*See id.*)

Another practical effect of trusting in Plaintiffs' investor-list method of computing damages is that this Court is yet again being asked to assume, without any factual basis, that Defendants paid themselves with investor funds by sending withdrawals to a wide range of corporate entities with which they share no apparent relationship.  Focusing only on the six months of bank records in the Illustrative Spreadsheets, Plaintiffs' investor list-based approach to categorizing withdrawals calls on this Court to assume that Defendants controlled accounts in the names of the following entities:  Wachovia Bank, Banco Conavi, Loyal Bank Limited, Forex Investment Team, Bancolombia (Panama) S.A.P., Bank United, Banco Patagonia Sudameris Sa, Groove Media Ltda, Barnett Bank of Jacksonville, Bull and Bear Investment, Jesmar Panama, Finatec, Gamma Zg Mercadeo, Enterprise Design, Semar Internacional, World Tours, and Finatek LLC.  (*See* Illustrative Spreadsheets.)  None of these entities are specifically mentioned in the Complaint or in any of Plaintiffs' other submissions as having any relationship whatsoever with Defendants.  The notion that Defendants controlled bank accounts in each of these entities' names appears to be based on nothing more than the speculation of Class Counsel.  (*See, e.g.*,

Tr. 31 (KACHROO: "[T]his is a particular kind of fraud, foreign exchange fraud, so the defendants created companies that would make it seem like they were trading but, in fact, there were no earnings, as we can see from the statements period."); Compl. ¶ 60 ("Upon information and belief, Defendants also paid themselves and friends, and misappropriate substantial amounts of funds to other business ventures, including Swiss, Panamanian and Colombian front companies controlled by Sanchez and Baez.").)

## 2.  **Circulated Funds**

Plaintiffs determined whether a withdrawal fell within their third category of "circulated funds between bank accounts" by inspecting the FIT Corp. bank records and figuring out whether a withdrawal constituted "funds deposited and withdrawn by the same source."  (2/16/17 Kachroo Decl. ¶ 19; 2/16/17 Apak Decl. ¶ 6(B) (defining "circulated funds" as "any deposits and withdrawals from the same source (usually a bank or specific bank account)").)  Unlike in their third inquest submissions, Plaintiffs appear to have removed all such "circulated funds" from their claimed damages in their present inquest submissions.  At least, it is apparent from this Court's review of Plaintiffs' spreadsheet for May 2005, that Plaintiffs have now removed from their claimed damages the entire $5 million in withdrawals from the FIT Corp. account that were directed to Defendants' money-market account and to UBS Ag – which, together, had also deposited more than $5 million into that same FIT Corp. account, in the same month.  (*See* May 2005 Spreadsheet.)

According to Plaintiffs' own computations, their removal of all of the circulated funds from their purported damages should have decreased their last-claimed damages by approximately $12.74 million.  In this regard, this Court notes that, in Plaintiffs' third inquest submission, they asserted that "circulated funds" totaled $18,210,448.21 (Pl. Hr'g Ex. 1, at 1-2;

Pl. Hr'g Ex. 2, at 2), while, in their current submissions, they have corrected this amount to $30,951,527.58 (2/16/17 Kachroo Decl. ¶ 34; 2/16/17 Apak Decl. ¶ 19). In effect, with regard to the treatment of circulated funds, Plaintiffs have now admitted that their last inquest submission contained a *$12.74 million mistake.* Yet, despite this admission, Plaintiffs' overall claimed compensatory damages have only decreased by $4 million (*compare* Tr. at 3 (asserting $40,711,698.63 in damages) *with* 2/16/17 Kachroo Decl. ¶ 40 (asserting $36,870,941.85 in damages)), highlighting the significance of Plaintiffs' offsetting change in methodology discussed above.

### 3. Company Expenses

Plaintiffs categorized withdrawals as falling within their fourth category of "company expenses" if the withdrawals constituted "expenditures made for day to day operations of the company for third party services such as rent, payroll fees, taxes, and consulting and accounting fees." (2/16/17 Kachroo Decl. ¶ 19.) These "company expenses" were excluded from Plaintiffs' damages, and totaled $1,285,306.27 overall. (*Id.* ¶¶ 19, 34; *see also* 2/16/17 Apak Decl. ¶ 3 ("AP Consulting was informed that day to day expenditures of the company irretrievably made to third parties such as rent, taxes, payroll fees, consulting and accounting fees, should be deducted as 'Company Expenses' from [damages].").) Plaintiffs did not explain how they determined whether a withdrawal was made to pay a "company expense"; nor have they provided a comprehensive list of such expenses, despite this Court's having admonished Class Counsel at the 1/11/17 Hearing for her prior lack of transparency on these points. At the 1/11/17 Hearing, this Court stated to Class Counsel:

> I'm supposed to be doing something other than rubber-stamping, and I have to have transparency in what you're doing. For that matter, if you're telling me you're eliminating expenses, I don't know if you gave me a list of what it is that you're telling me you

> figured out are expenses and therefore should be eliminated. . . . And what do I do with something like the wire transfers to Stanford International Bank? How do I know what that is? In any kind of entity situation, how do I know what I'm looking at?

(Tr. at 33.)

Plaintiffs have now provided a small number of examples of "company expenses" in the Illustrative Spreadsheets. For instance, in the May 2005 Spreadsheet, Plaintiffs listed the following as "company expenses": "Analysis Fee" ($1,115.00), "Jade Residences Dir De[b]it ($416.29),[20] "Fpl Direct Debit Elec Pymt Ppda" ($38.90), and "Department Of State" ($150.00). (May 2005 Spreadsheet, at 2-3.) A small list of examples, however, is no substitute for a transparent and reasoned explanation of how Plaintiffs determined such line items were "company expenses" and others were not. As noted in the 12/6/16 Order, Plaintiffs previously included each of these expenses, except for the Department of State expense, in their damages computation (12/6/16 Order, at 11 & 12 n.8), despite having represented that they had deducted $8,155,616.94 in "miscellaneous expense amounts not disbursed or withdrawn into the bank accounts of Defendants nor redeemed by the Class of investors" at that time (10/11/16 Kachroo Decl. ¶ 32; *see also* Pl. Proposed Findings ¶ 30).

Without any explanation as to how they determined that these withdrawals were "company expenses," but others – such as withdrawals sent to entities like Bank United ($2,426.56), Groove Media Ltda ($6,360.00), or Barnett Bank of Jacksonville ($15,000.00) (*see* May 2005 Spreadsheet, at 2-3) – were not, this Court simply does not have sufficient information before it to know whether Plaintiffs have understated the amount of "company expenses" by cherry-picking only relatively small withdrawals. This is particularly true given the unexplained

---

[20] *But see* n.4, *supra*.

variation in the amount of such third-party expenses Plaintiffs have deducted from damages in each of their inquest submissions: in their first two submissions, they deducted $8,155,616.94 in "miscellaneous expenses" (10/11/16 Kachroo Decl. ¶ 32; *see also* Pl. Proposed Findings ¶ 30); in their third, they deducted $1,146,352.73 in "total expenses" (Pl. Hr'g Ex. 2, at 2); and in their present submission, they deduct $1,285,306.27 in "company expenses" (2/16/17 Kachroo Decl. ¶ 34). Given these variations, Plaintiffs' thinking as to what constitutes a non-compensable third-party expense has clearly changed over time. At no point, however, have Plaintiffs provided any clarity as to their thinking on this issue.

Moreover, it is not clear why Plaintiffs would include payments to third parties such as Jade Residences, the apparent owner of one of Defendants' condominiums, in "company expenses," but exclude payments made to Bank United, one of Defendants' secured creditors. (*See* Fla. Court Docs., at 5-6.) Instead of categorizing payments to Bank United as "company expenses," Plaintiffs have repeatedly counted such payments towards their damages. (*See, e.g.*, May 2005 Spreadsheet, at 2; November 2007 Spreadsheet, at 4.) As noted above, however, Plaintiffs have equated their damages with "withdrawals by Defendants to accounts under their control." (2/16/17 Kachroo Decl. ¶ 34). Asserting that Defendants had control over the account of a third-party secured creditor, of course, makes no sense.

In sum, Plaintiffs have not adequately explained how they determined that certain withdrawals were "company expenses" and others were not, and, to the extent that Plaintiffs have hinted as to their decision-making, that decision-making appears to be inconsistent. The net effect of all of this is Court does not have reasonable certainty that Plaintiffs' damages are not again being inflated.

**B.      Failure To Establish Class
         Damages to a Reasonable Certainty**

As discussed, Plaintiffs are asserting that all withdrawals from the subject FIT Corp.

accounts that do not fall within one of the above-three categories (*i.e.*, an investor withdrawal,

circulated funds, or company expenses) should be considered "withdrawals by Defendants to

accounts under their control," and should therefore count towards Class damages.  (2/16/17

Kachroo Decl. ¶ 19.)  Both the investor withdrawals and company expense categories, however,

are ill-defined for the reasons set forth above.  Moreover, subscribing to Plaintiffs' definition of

investor withdrawals leads to the highly speculative conclusion that Defendants enriched

themselves with investor funds through payments to a wide variety of individuals and corporate

entities with which Defendants share no apparent or alleged relationship.  Taken as a whole,

Plaintiffs' latest inquest submissions are just as speculative and untrustworthy as their past

submissions.

The chronology of Plaintiffs' damages submissions bears repeating.  In Plaintiffs' initial

inquest submission, they sought $57,858,795.56 in compensatory damages, supported by little

more than four pages of spreadsheets purporting to summarize unspecified computations

performed by unspecified individuals on data purportedly found in seven years of undisclosed

bank records.  (Pl. Proposed Findings, at 8; 11/20/15 Damages Spreadsheets.)  In Plaintiffs'

second inquest submission, they adjusted their compensatory damages upward to

$58,706,074.22, apparently due to a "minor arithmetic error" in their prior submission (Pl. Supp.

Mem., at 11; 10/11/16 Apak Decl. ¶ 16), and again failed to set forth any transparent explanation

as to how their damages were computed.  While Plaintiffs' submission, at that time, of all seven

years of bank records did enable this Court to check – on a sample basis – some of Plaintiffs'

calculations, that review only raised more doubts regarding the trustworthiness of Plaintiffs'

computations, and led this Court to issue an Order setting forth its suspicion that Plaintiffs had potentially overstated their damages claim by millions of dollars and/or based their computations, in large part, on the speculation of counsel. (*See* 12/6/16 Order, at 8-16.) In Plaintiffs' third inquest submission, provided to the Court at the 1/11/17 Hearing, Plaintiffs admitted that this Court was correct in suspecting that Plaintiffs' prior damages figures were inflated (Tr. at 14-17, 23-26, 39-40), and adjusted their proposed compensatory damages award downward by approximately $18 million to $40,711,698.63 (Tr. at 3; *see also* Pl. Hr'g Ex. 2, at 2). Both Plaintiffs' counsel and their forensic accountant admitted at the hearing, however, that Plaintiffs' proffered damages figures were *still* inflated, as they still failed to account for the circular movement of millions of dollars in and out of Defendants' bank accounts – an issue that this Court had specifically identified in its 12/6/16 Order. (*Id.* at 17, 39-40; 12/6/16 Order, at 9-11.) In their fourth inquest submission, Plaintiffs then admitted that their third submission had inflated their damages claim by at least $12.74 million, through "circulated funds" that they had erroneously failed to deduct from damages. (*Compare* Pl. Hr'g Ex. 2, at 2 *with* 2/16/17 Kachroo Decl. ¶ 34.)

Now, rather than simply removing all "circulated funds" and providing this Court with a factual basis for their previous assertion that Defendants stole investor money by funneling it to a large number of accounts that do not bear their names, Plaintiffs have overhauled their damages computation methodology and introduced all of the new errors and uncertainties discussed above. Accordingly, while Plaintiffs are now seeking nearly $22 million less in damages than their previous, largest request of $58,706,074.22 (Pl. Supp. Mem., at 11), their latest damages figure of $36,870,941.85 (2/16/17 Kachroo Decl. ¶ 40) still appears to be inflated by a substantial amount, and to be supported largely by the speculation or arbitrary decision-making

of Class Counsel. Under the circumstances, this Court concludes that Plaintiffs have not demonstrated Class damages to a reasonable certainty and that – apart from the damages discussed above for the named Plaintiffs, no damages may be awarded.

In reaching this conclusion, this Court does not mean to suggest that the Class suffered no damages as a result of Defendants' conduct. To the contrary, given Defendants' default, this Court must assume that Plaintiffs' allegations of a Ponzi scheme are true. *See Finkel*, 577 F.3d at 84. In a Ponzi scheme, however, the perpetrators may return some money to investors in order to give their scheme an appearance of legitimacy. *See MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 268 n.1 (2d Cir. 2011). ("A 'Ponzi scheme' is one in which earlier investors' returns are generated by the influx of fresh capital from unwitting newcomers rather than through legitimate investment activity."). Indeed, according to Plaintiffs' Complaint, Defendants returned one investor's entire $2,269,655.65 investment to him (Compl. ¶ 38), and according to Plaintiffs' latest inquest submissions, Defendants purportedly returned $71,574,544.69 to investors overall (2/16/17 Kachroo Decl. ¶ 34). Plaintiffs' burden on this inquest was to establish with reasonable certainty how much of the Class's investment was *not* returned to the Class. *See, e.g.*, *Lukaszuk*, 2007 WL 4699018, at *6 (collecting cases). Through their submissions, they have failed to demonstrate this. As discussed above, Plaintiffs have not even provided this Court with a clear picture of how much money the Class actually invested into Defendants' Ponzi scheme, let alone how much they received back from Defendants, before Defendants ended the scheme. (*See* Discussion, *supra*, at Section IV(A).) Instead, Plaintiffs have provided this Court with four demonstrably unreliable, unsupported, and speculative inquest submissions, which have varied by as much as $22 million in the amount of damages

claimed.  Under the circumstances, any damages award made by the Court to the Class would be unduly speculative and thus improper.

## C.     Decertification of Class Due to Inadequacy of Class Counsel

In light of Class Counsel's repeatedly demonstrated inability to make an adequate damages presentation, and the frustrations that this Court has experienced as a result, I recommend that the Court take the additional step of decertifying the Class, *sua sponte*, due to the inadequate representation of Class Counsel.

"An order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C).  Indeed, "courts are required to reassess their class rulings as the case develops," *Boucher v. Syracuse Univ.*, 164 F.3d 113, 118 (2d Cir. 1999) (internal quotation marks and citation marks omitted), and "'can always alter, or indeed revoke, class certification at any time before final judgment is entered should a change in circumstances' render a class action no longer appropriate," *Mendez v. The Radec Corp.*, 260 F.R.D. 38, 42 (W.D.N.Y. 2009) (quoting *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 n.9 (2d Cir. 2007)); *see also Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it in light of subsequent developments in the litigation").  A court may decertify a class *sua sponte* where the requirements for class certification under Rule 23 are no longer satisfied.  *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 158 F.R.D. 301, 304 (S.D.N.Y. 1994) (citations omitted).  The adequacy of class counsel is one such requirement.  *In re Livent, Inc. Noteholders Sec. Litig.*, 210 F.R.D. 512, 516 (S.D.N.Y. 2002) (citing Fed. R. Civ. P. 23(a)(4)); *cf. In re Integra Realty Resources, Inc.*, 262 F.3d 1089, 1112 (10th Cir. 2001) ("Once the decision to certify a class has been made, the court remains under a continuing duty to monitor the adequacy of representation

to ensure that class counsel provides zealous, competent representation through the proceedings").

In determining whether to decertify a class based on the inadequacy of class counsel, courts have considered factors relating to the competency, responsibility, and vigor with which class counsel has prosecuted the action, and the prejudice that would result to the class in the event that the class remains certified or is decertified. *See, e.g.*, *Mendez*, 260 F.R.D. at 49; *Koss v. Wackenhut Corp.*, No. 03cv7679 (SCR), 2009 WL 928087, at *9-10; *Sheinberg v. Sorenson*, No. 00-6041 (CCC), 2008 WL 928121, at *1-2 (D.N.J. Apr. 4, 2008), *vacated and remanded*, 606 F.3d 130 (3d Cir. 2010); *Dubin v. Miller*, 132 F.R.D. 269, 273-74 (D. Colo. 1990); *cf.* Fed. R. Civ. P. 23(g)(1)(B) (in appointing class counsel, the court "may consider any other matter [in addition to those enumerated at Fed. R. Civ. P. 23(g)(1)(A)] pertinent to counsel's ability to fairly and adequately represent the interests of the class"). Class Counsel's conduct in prior litigation is also relevant to the analysis. *Koss*, 2009 WL 928087, at *9 (citing *Kingsepp v. Wesleyan Univ.*, No. 89cv6121 (DNE), 1992 WL 230136, at *1 (S.D.N.Y. Sept. 3, 1992)).

As set out in detail above, beginning with Class Counsel's conduct in *Bolivar I*, resulting in the case's dismissal due to a failure to prosecute (*see* 8/22/11 Order of Dismissal), Class Counsel has demonstrated a pattern of failing to adhere to the Court's instructions and of providing sloppy, careless, incomplete, and even misleading submissions to the Court. Moreover, despite being given four opportunities to provide coherent and transparent inquest submissions as to Class damages, Class Counsel has failed to provide the Court with anything that the Court can even modify to estimate Class damages to a reasonable certainty. Considering the history of this case, particularly since the Class was certified, this Court is persuaded that Class Counsel's conduct has been detrimental to the interests of the Class, and that Class

Counsel can no longer be viewed as "adequate" under Rule 23. This Court therefore recommends that the Court *sua sponte* decertify the Class on that basis, so as to allow unnamed Class members to seek new counsel.

This Court notes that decertification at this point would not prejudice the Class from a statute-of-limitations perspective, as the statute of limitations has been tolled since the filing of the Complaint for "all would-be class members." *Mazzei v. Money Store*, 829 F.3d 260, 267 (2d Cir. 2016) (citing *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974)). Indeed, "any putative member of the decertified class who wishes to do so may file an individual action . . . on a similar claim (so long as the individual action is instituted during whatever amount of time remains in the limitations period)." *Id.* (citing *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 353-54 (1983)) (parenthetical in original). To the extent any statute-of-limitations issues existed at the time of the filing of the Complaint, those issues would be due to Class Counsel's failure to prosecute *Bolivar I*, not any present decision to decertify.[21]

---

[21] This Court also notes that the weight of authority in this District holds that a statute-of-limitations defense is an affirmative defense that is waived upon default, *see Melgadejo v. S & D Fruits & Vegetables Inc.*, No. 12cv6852 (RA) (HBP), 2015 WL 10353140, at *8 n.6 (S.D.N.Y. Oct. 23, 2015), *report and recommendation adopted*, 2016 WL 554843 (Feb. 9, 2016); *Koch v. Rodenstock*, No. 06cv6586 (BSJ) (DF), 2012 WL 5844187, at *3 n.2 (S.D.N.Y. May 19, 2012), *report and recommendation adopted*, 2012 WL 5845455 (Nov. 19, 2012); *Latimore v. Schilling*, No. 06cv7639 (BSJ) (AKP), 2008 WL 2421628, at *2 n.4 (S.D.N.Y. June 13, 2008) (similar), *report and recommendation adopted*, 2008 WL 2774465 (July 16, 2008); *but see De Santis v. City of New York*, No. 10cv3508 (JPO) (GWG), 2013 WL 3388455, at *5 (S.D.N.Y. July 8, 2013), *report and recommendation adopted*, 2014 WL 228659 (Jan. 22, 2014), and that, given Defendants' failure to appear at any stage of this case or the earlier case brought by Plaintiffs, it seems likely that Defendants would again default, if any new action were commenced by other investors.

## <u>CONCLUSION</u>

For all of the foregoing reasons, I respectfully recommend that the Class be decertified, and that damages be awarded only to the named Plaintiffs, as follows:

1. **For plaintiff Bolivar:**

   a. $168,000 in treble damages,

   b. $45,539.51 in prejudgment interest, and

   c. additional prejudgment interest, on the principal amount of $56,000.00, at the rate of 9% per annum from October 9, 2015 to the date of entry of final judgment.

2. **For plaintiff Quintero:**

   a. $323,930.61 in treble damages,

   b. $70,980.74 in prejudgment interest, and

   c. additional prejudgment interest, on the principal amount of $107,976.87, at the rate of 9% per annum from October 9, 2015 to the date of entry of final judgment.

3. **For plaintiff Rubio:**

   a. $311,032.50 in treble damages,

   b. $68,154.46 in prejudgment interest, and

   c. additional prejudgment interest, on the principal amount of $103,677.50, at the rate of 9% per annum from October 9, 2015 to the date of entry of final judgment.

I further recommend that costs be awarded to Plaintiffs in the amount of $350.00.

Finally, I recommend that all four Defendants be held jointly and severally liable for each of the treble damages awards and costs, but that only defendants Sanchez, Baez, and FIT New York be held jointly and severally liable for the prejudgment-interest awards.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail).

Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Paul G. Gardephe, United States Courthouse, 40 Foley Square, Room 2204, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Gardephe. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBEJCTIONS AND WILL PRECULDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated: New York, New York
March 16, 2017

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

73

Copies to:

Hon. Paul G. Gardephe, U.S.D.J.

Plaintiffs' counsel (via ECF)

FIT International Group Corp.
c/o Carlos Zayas
1221 Brickell Avenue, 19th Floor
Miami, FL 33131

Forex International Team Inc.
c/o Secretary of State
99 Washington Avenue
Albany, NY 12210

Jairo Enrique Sanchez
Dilia Margarita Baez
Calle 140 6-10 Torre 6
Apartamento 501
Bogota, Colombia 110121